Filed 5/12/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TIBURON OPEN SPACE COMMITTEE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF MARIN, <br><br> Defendant and Respondent; <br><br> THE MARTHA COMPANY, <br><br> Real Party in Interest and Respondent; <br><br> TOWN OF TIBURON, <br><br> Intervener and Appellant. | A159860 <br><br> (Marin County Super. Ct. No. CIV1704069) |

The Martha Company (Martha) owns the largest undeveloped parcel of real property in the vicinity of the Town of Tiburon, 110 acres on top of a mountain, overlooking much of the town and commanding a stunning view of San Francisco Bay. One county supervisor described the site as "the last remaining undeveloped ridgeline on the Tiburon peninsula," and, as such, "it's treasured by residents and visitors." Another supervisor called it "amazing," "unique," and "an absolute treasure," while a third termed it a "jewel."

1

For decades, Martha has tried to get official approval from the County of Marin to develop the property. Local opposition has been intense and unrelenting.

One manifestation of that opposition has been periodic bouts of litigation in federal district court, starting in 1975, between Martha and the County. The litigation produced two stipulated judgments, one in 1976, the other in 2007. The most significant aspect was that the County twice solemnly—and publicly—agreed to approve Martha building no fewer than 43 units on the property.

Approval for Martha finally came in October 2017—12 years after its latest application for permission to develop the property—when the County certified an environmental impact report and conditionally approved Martha's master plan to construct 43 single-family residences. The County took this action in the belief it was compelled by the stipulated judgments, particularly the 2007 one.

It is axiomatic that governmental powers are indefeasible and inalienable. They cannot be surrendered, suspended, contracted away, waived, or otherwise divested. In short, government cannot bind itself not to govern by exercising its rightful powers, nor can it bind the hands of its successors.

The primary issue here, advanced by the Town and a number of interested Tiburon residents, is whether the County violated this principle by complying with an ostensibly final judgment. The allegation is that the County in effect agreed it would not follow or enforce state law, specifically, the California Environmental Quality Act (CEQA), to prevent development of an anticipated project by the other party to the litigation.

We conclude that the County did not abdicate its authority or otherwise

2

undertake not to comply with CEQA. With its eyes wide open, the County complied with a binding, final judgment to which it was a party, and that judgment in no way anticipated or legitimated ignoring CEQA.

We reject the remaining objections from the Town and interested persons, and affirm the judgment in full.

## BACKGROUND[1]

### The Federal Court Judgments

Martha is the owner of 110 acres of real property that is, for all practical purposes, undeveloped. Although the site is located in an unincorporated area of the County of Marin, it overlooks much of the Town of Tiburon. It also commands a sweeping panoramic view of almost all of the San Francisco Bay.

Developing the site with single-family residences has been Martha's goal for decades. That prospect has generated intense opposition, especially from the Town and residents of Tiburon. But also from the County, which was twice in federal district court opposing Martha's plans to develop the site. That litigation concluded with two judgments entered pursuant to stipulated settlements. Those judgments are at the heart of this dispute.

The current chapter of the dispute begins in 1974, when the County adopted a re-zoning measure that reduced the number of residences Martha could build on the site from a minimum of 300 units to a maximum of 34.[2]

_____

[1] Our review has been considerably assisted by the exceptionally detailed 86-page Order After Hearing filed by the Honorable James T. Chou. Quotations in this portion of our opinion are from that document unless otherwise noted, with minor non-substantive editorial modifications for clarity.

[2] And maybe not even that: in 2018 the district court stated that "approximate[ly] eighty-eight acres of the Property were rezoned to permit only one unit for every five acres. The new ordinance thus limited Martha to

The re-zoning would also preclude Martha from building on an area known as the Ridge and the Upland Greenbelt. In response, Martha sued the County in federal district court, seeking $6 million on the theory that the re-zoning effected a regulatory taking of property.

"In December 1976 Martha and the County settled the federal lawsuit by a stipulated judgment (the 1976 Judgment) which provided in part: 1 Martha was allowed to develop no fewer than 43 single-family homesites on minimum one-half acre lots; and 2 Martha could place some homesites within the Ridge and Upland Greenbelt, defined as 300 ft. horizontally and 100 ft. vertically of visually prominent ridgelines. The County also determined that 43 single-family units located on one-half acre minimum lots 'is consistent with the goals of the general plan and will allow the owners a feasible economic use of their property.' The settlement took place before Martha submitted its proposed master development plan, drawings, or maps.

"In return, Martha was required to dedicate about 50% of the land to the County as open space and to allow the County to develop public hiking trails in these open spaces. This agreement was made to run with the land. In a letter to the Board of Supervisors dated December 23, 1976, commenting on the stipulated judgment, County Counsel explained that Martha's master development plan must still meet 'procedural and hearing requirements, including an environmental impact report, and comply with all applicable design standards.' "

At this point, because of its centrality, the express language of the 1976 Judgment must be quoted, the most important of which was the following: "[A]fter review of the site and a proposed development plan of the Martha

---

constructing twenty-seven units, with a possible 'bonus' of seven units, for a total of thirty-four units." (Record citations omitted.)

4

Co., property the Planning Department and Board of Supervisors have determined that development of the parcel with not less than a minimum of 43 single family residential units located on one-half acre minimum lots is consistent with the goals of the general plan . . . . [¶] . . . [¶] It is expressly agreed that 43 residential units is the minimum number of units to be allowed on the Martha Co. property."[3]

"After years of planning, Martha submitted its application for a development plan to the County, and the County in turn directed Martha to file its application with the Town for approval. After the Town conducted years of study without rendering a decision, Martha withdrew its application from the Town and on April 19, 2005, reapplied to the County.

"The County still refused to process the application, asserting the property would require services from the Town over which the County lacked jurisdiction. Also, neighbors who own parcels within 300 feet of Martha's property (the 'property owners'), complained to the County that the 1976 stipulated judgment was void and violated their Due Process rights because the County entered into the stipulated judgment without providing them notice and an opportunity to be heard."

The County responded by returning to federal district court in 2005, asking that it "be relieved from operation of the Judgment." Martha and the

---

[3]  Immediately followed by this language: "The Board of Supervisors, Planning Commission and Planning Department will, in good faith, consider a proposed rezoning and a development plan or plans for development of a greater number of units submitted by the Martha Co., . . . including, but not limited to, esthetics, protection of ridge lines, environmental factors, traffic generation and community services impact."

  The judgment itself recited that "Forty-three (43) residential units is the minimum number of units to be allowed on the Martha Co. property," followed by reiteration of the just-quoted language.

Town were named as defendants, as were a number of the property owners—presumably because they had threatened to sue the County it if moved to enforce the 1976 judgment. The County alleged that the 1976 Judgment was "void and unenforceable [because], inter alia, environmental laws have changed in the 30 years since the 1976 Judgment, and while the limits of the County's authority to contract away its discretion over certain environmental land use issues was not clear in 1976, it is now clear that it was illegal for the County to have contracted away its authority to evaluate the minimum density provisions of the proposed development without conducting a full environmental review as required by the California Environmental Quality Act . . . . [¶] The County alleged that to bind it to the 1976 Judgment under these circumstances 'would thwart the strong public policy of the State of California to allow a development of this magnitude, on environmentally sensitive and constrained land to proceed without the development and density being subject to CEQA review.' "

The County's position was echoed by the property owners, who "filed counterclaims against the County, Martha and the Town . . . asserting [that] by entering into the 1976 Judgment the County violated the property owners' federal due process rights; the 1976 Judgment violated their state and local notice and hearing rights without providing them notice and an opportunity to be heard; and the County illegally contracted away its police powers over its statutory land use authority when it entered into the judgment."

After the district court dismissed the County's complaint and the property owners' counterclaims,[4] the County and Martha again drafted and

---

[4] The district court concluded that neither the County nor the property owners could meet the demanding standard required to set aside a final judgment under Rule 60 of the Federal Rules of Civil Procedure: relief must be "reserved for those cases of 'injustices which . . . are deemed

submitted a Stipulation for Entry of Judgment and Procedures for Enforcing Judgment Entered in the first action.[5]  The stipulation itself is not in the record.  Because of its importance, the judgment—dated November 7, 2007, and hereafter cited as to 2007 Judgment—must be described in some detail. It opens with the following:

"Based upon the [dismissal] rulings of the Court, the County acknowledges that it must process a subdivision map in conformance with the 1976 Judgment.  Therefore the parties have settled all litigation between them by creating a timeline and procedures for enforcing the 1976 Judgment, and this Court implements such settlement by ordering as decreeing as follows:

"[¶] . . . [¶]

"2.  1976 Judgment

"2a.  Right to 43 homes.  Pursuant to the 1976 Judgment, the County is required to approve forty-three (43) homesites on the Martha Property unless the parties subsequently agree otherwise in writing.

"2b.  Minimum Half-Acre Lots.  Pursuant to the 1976 Judgment, each of the 43 lots to be approved by the County shall be at least one-half acre in size, unless the parties subsequently agree otherwise in writing.  These lots

---

sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." (*United States v. Beggerly* (1998) 524 U.S. 38, 46.)

Still pending was Martha's counterclaim/motion seeking, in the words of the district court, "that the County process and approve its development application."  This was eventually denied in July 2018.  (See fn. 7, *post*.)

[5]  County Counsel told one County Supervisor that "Facing a very costly trial before a very hostile judge with a potentially catastrophic result (i.e., appointment of a special master to process the development and damages for refusing to process [Martha's application] for 3 years), the County settled via a new Judgment Pursuant to Stipulation."

7

are intended to be placed on geologically safe portions of the site, without the necessity for extensive landslide repair, rather than in the path of known landslides. If the parties cannot agree whether any required landslide repair is unreasonably extensive under the circumstances, the parties may petition this Court for binding instructions.

"2c. <u>Lots within the Ridge and Upland Greenbelt</u>. In conformance with the 1976 Judgment, the County shall allow some development within the Ridge and Upland Greenbelt.

"3. <u>Revised Scope of Application</u>. Martha intends to revise its 2005 Application to request approval of a forty-three (43) unit subdivision map as required to be approved under the 1976 Judgment ('2007 Application'), . . . and to file such 2007 Application with the Marin County Community Development Agency.

"4. <u>Action Required by County to Implement the 1976 Judgment</u>.

"4a. <u>Action on 2007 Application</u>. The County shall procure a full scope Environmental Impact Report (EIR) for the project. The County shall take final action to certify a final Environmental Impact Report (EIR) in conformity with the California Environmental Quality Act, . . . and to act on the 2007 Application within fourteen months of the date on which the 2007 Application is filed.

"4b. <u>Legal Infeasibility of Any Alternative or Mitigation Measure Inconsistent with the 1976 Judgment</u>. The County has acknowledged that any development alternative, or any proposed mitigation measure, which does not accord Martha all rights to which it is entitled under the 1976 Judgment is legally infeasible unless required to assure health or safety. Should the parties disagree as to what measures or alternatives are required to ensure 'health or safety,' the parties shall jointly petition this Court for

8

binding instructions which implement the 1976 Judgment and this Judgment to the greatest extent feasible consistent with health and safety.

"4c. <u>Protected Species</u>. Notwithstanding the foregoing, it is not the parties' intent to allow the unmitigated taking of any endangered, threatened, listed, or otherwise protected species identified in the extensive environmental reviews prepared for the Martha Property by the Town of Tiburon ('Identified Species'). If the parties cannot agree on adequate mitigation measures concerning Identified Species, the parties shall jointly petition this Court for binding instructions concerning the adequacy of such mitigation.

"[¶] . . . . [¶]

"4f. <u>Prompt Action on Final Map</u>. The County shall promptly review and process Martha's proposed Final Map and approve the Final Map on the first legally permissible date following approval of the Tentative Map. The filing of a legal challenge by third parties to County action shall not constitute grounds for refusal to process, approve and record the Final Map. Moreover, the County shall not use any County custom, policy, or procedure which is not mandated by state law to deny or delay approval and recordation of the Final Map.

"[¶] . . . . [¶]

"6. <u>Effect of Subsequent Events</u>.

"6a. <u>Defense of Approvals</u>. Should litigation be commenced to overturn County certification of the environmental impact report for this project or to overturn County approval of development, or to otherwise interfere with any permit or entitlement which the County has granted to Martha, then the County shall take all action necessary under state law to defend such certification, approval, permit or entitlement."

9

## Subsequent Administrative Proceedings

"In December 2008, Martha filed its current development application with the County. . . . [I]n March 2011, the County, as the lead agency prepared and circulated a draft EIR[6] . . . which identified and analyzed the environmental setting, impacts and mitigation measures for these environmental conditions: Section 5.1—Transportation; Section 5.2—Air Quality; Section 5.3—Noise; Section 5.4—Geology/Soils; Section 5.5—Hydrology/Water Quality; Section 5.6—Biological Resources; Section 5.7—Public Services; Section 5.8—Visual Quality; and Section 5.9—Cultural Resources. The draft EIR also examined four alternatives to the project: 1—a 'No Project' alternative mandated by CEQA (Cal. Code Regs., tit. 14, § 15126.6(e)); 2—a 'Reduced Density Alternative' of 32-units which proposal was contained in a prior M.O.U. between Martha and [Town], but which agreement had since expired [see fn. 25, *post*]; 3—a 'Visual Quality Alternative' of 43 units on lots smaller than originally proposed by still within the 'minimum lot size contained in the Judgment' and with considerably fewer homes at higher elevations in the Ridge Rd. section; and 4—a 'Biological Resources Alternative' consisting of 43 homes, but in a reconfigured site plan of smaller lots designed to reduce the biological impacts from the proposed project.

"On April 25, 2011, the County Planning Commission held a public hearing on the Draft EIR and the Commission received written and oral comments on the Draft EIR from individuals, public entities and neighbors to the project. The Commission responded to these comments in the Final EIR (FEIR). The County circulated the FEIR's Responses to Comments on June

---

6   This was the third draft EIR. The first and second were prepared by the Town, in 1996 and 2001, respectively.

28, 2013. . . .

"On October 22, 2013, the Board of Supervisors held a public hearing to consider certification of the FEIR and to further discuss the impacts and the feasibility of proposed mitigation measures in the FEIR. [¶] The Board heard recommendations from the Planning Commission, a presentation by Martha's EIR consultant, and public comments. At the close of the session the Board continued the hearing for further clarification on impacts and mitigation measures, e.g., traffic impacts during school peak hours, residential water pressure, fire flow, cumulative traffic impacts, threat to red-legged frog, and continued the hearing to receive this additional information. Martha's EIR consultant Nichols/Berman prepared responses for the specific issues raised. [¶] On March 11, 2014 the Board of Supervisors held a duly-noticed public hearing to consider certification of the FEIR and to answer their concerns over 'whether those significant impacts have been shown to be mitigable and whether the mitigations identified are actually feasible.' [¶] . . . [¶]

"The Board declined to certify the FEIR at that time concluding 'there are too many unknowns' about the proposed mitigation measures for water pressure and fire flow because an ultimate feasibility determination depends on a more specific development proposal; some mitigation measures in the FEIR 'do not fully mitigate the significant impacts'; and the applicant has not demonstrated 'project feasibility and project compliance with mitigation measures contained in the Final EIR.' The Board voted to retain jurisdiction over the Final EIR until Martha submitted a more specific proposal to demonstrate the feasibility of the mitigation measures, with input from [additional agencies]."

More than three years passed before Martha returned with the "more

11

specific proposal" demanded by the Supervisors.[7]  In June 2017, Martha submitted a modified Master Plan that reduced the size of some lots and relocated others "downslope from the original plan and away from special status plant habitats."[8]

[7]  During this period, Martha went to district court for a third time.  In a 2018 order, the district court summarized what happened:  "[O]n May 25, 2016, Martha filed a Motion to Enforce and Require Marin County's Compliance with Judgments and, alternatively, for Appointment of a Special Master ('Prior Motion to Enforce').  In that motion, Martha accused the County of violating the Stipulated Judgments and requested that the Court set new timelines and procedures by which the County of Marin must take final action on Martha's development application.  Alternatively, Martha sought appointment of a special master to oversee the completion of Martha's 'entitlement process' and an order 'requiring the County, including any third party in active concert with the County, to cease and desist from taking actions inconsistent with or that otherwise undermine the terms of the two judgments.'  [¶]  The Magistrate held a hearing on the Prior Motion to Enforce.  The parties stipulated to deadlines for Martha to submit revised plans and for the County to process those plans up to a final decision on the EIR.  As a result, the Magistrate recommended denying the motion without prejudice, and authorizing her [the Magistrate] to review the parties' anticipated status reports.  The Court accepted the Magistrate's recommendations."  (Record citations omitted.)

[8]  When the Board ultimately approved the project, among the "Findings Pursuant to the California Environmental Quality Act" was language describing how the project was still at a very preliminary stage: "The Master Plan application proposes to create 43 residential lots for development of single-family homes.  The applicant is not proposing to construct any homes at this time, but is requesting approval of a series of design guidelines and standards, including minimum house sizes (square footage) for each lot, that would regulate future home construction on the property. . . .  The applicant proposes to construct roads and utilities to serve each of the 43 residential lots.  The application also includes a proposal to construct a temporary construction access road that would be used for all phases of project construction, including future home construction." "Applicant['s] proposed grading is intended to prepare the project site for residential development by installing roadways and utilities and repairing landslides and unstable areas. . . .  The applicant proposes to improve or

"Additionally, Martha agreed to a phased-review of its development application.  The first phase, at issue here, includes the certification of the Final EIR, the approval of Martha's modified Master Plan and approval of the rezoning application.[9] The Board held public hearings on September 19, 2017 and again on October 3 to consider the EIR, the modified Master Plan and rezoning application."  Via written comments and oral presentations at

---

repair landslides that have a higher potential to affect proposed improvements including residential lots."  "Proposed residential lots would range in size from 0.5 to 1.67 acres.  The 43-lot project has a gross density of one housing unit per 2.55 acres considering the entire 110-acre site area. . . . Houses would range in size from 5,000 square feet to 8,750 square feet."

Proposed non-residential features were also described:  "[T]wo parcels (Parcel A—68.89 acres and Parcel B—5.86 [acres]) would be offered for dedication to the Marin County Open Space District.  Parcel B is proposed as a Marin dwarf flax (a special status plant species) preserve.  The application also proposes an [sic] 265,000-gallon concrete water tank that would be constructed on Parcel C (0.36 acres), the downsizing and relocation of the existing 1-million gallon Forest Glen water tank, and a small parcel to be reserved for a possible future Marin Emergency Radio Authority . . . facility."

In its brief on these appeals, Martha provides some additional details:  "All lots would be in geologically stable areas.  Twenty-four lots would be next to the Hill Haven residential subdivision and accessed by an extension of Ridge Road.  Six lots would be located off Paradise Drive, and the remaining 13 lots would be accessed via Forest Glen Court, which would be extended from Paradise Drive (and upgrade an existing maintenance road).  Each of the 43 lots would include a landscape envelope, within which all residential improvements must be placed.  Roads and utilities would be constructed to serve the lots."

9  "Once the modified Master Plan is approved, Martha must next submit a Precise Development Plan and Tentative Subdivision Map to the County.  If those applications are approved, Martha will submit a Final Subdivision Map and applications for construction permits.  Martha must obtain approvals at each phase before the project may proceed to the next phase of approvals."

the hearings, the Board was made aware of the intense opposition to the project.[10]

## The Board's Hearings And Approval

The September 19 hearing commenced with County Counsel advising the Board of the litigation history and the two stipulated judgments. He characterized the 2007 Judgment as "very strong . . . and quite unusual" in that the Board's "normal" and "significant discretion" with regard to "planning and zoning matters" was "constrained in this case" because the 2007 Judgment "reiterated that the county is required to approve 43 units . . . on this property." He also mentioned that the district court's "supervision continues to this day."

A private consultant retained by the community development agency told the Board that the concerns voiced by the Board at a hearing in March 2014—when the draft EIR was presented—had been satisfactorily addressed by Martha, and "today we want to demonstrate the feasibility of the mitigation measures." Also, "One of the major concerns [of] the property is landslides," but Martha had addressed that by directing that "development is really placed in the area where there are no landslides which are pretty much

---

[10]   One manifestation of that opposition was a private effort that would have hamstrung any effort to develop the property. At the same time as the hearings were being held, a group calling itself the Tiburon Belvedere Residents United to Save the Trails (TRUST) sued Martha on the theory that the public's use of trails on the property established a recreational easement. The claim was rejected. TRUST's president and its counsel appeared at the first hearing to oppose Martha's plan to develop the site. At the second hearing the Board watched a video made by TRUST, and again heard from TRUST's counsel. The possible impact of that litigation was mentioned at several points in the hearings.

Other organizations opposing the project were the Watershed Alliance of Marin, the Marin Conservation League, and the "Sierra Club Marin group."

the ridge tops. . . .  [¶]  The master plan has been moved down and away from the top of the ridge."

The consultant also told the Board that "One of the issues we looked at was the visual impact.  When they [Martha] extended that roadway, I was concerned with what the visual impacts would be . . . .  Now they extended that road out further, but the mitigation for this was to place the homes further down the slope so that one would see the ridgeline."

"It was from these analyses that we concluded that No. 1, they [Martha] have a project which has a water tank that has been approved by the water district.  No. 2, they have fire flows, and they have a letter from the fire district saying they have adequate fire flow from all of the lots that documented that."  Moreover, "the water tank relocation . . . will not be visible from offsite," and "there's no increase in the loss of the woodland as a result of this change."  Too, Martha had "complied with the impact to endangered species by either avoiding or mitigating for them."

The consultant added "when I first had a meeting on this back in 2008 in Tiburon, the big issue to all the people at that meeting was, how are you going to construct the project?  How are you going to get construction equipment up there?  [¶]  The applicant [Martha] went back after that meeting and came up with the idea for a construction access road which . . . has been analyzed in the EIR, has been demonstrated . . . .  Its feasibility in the EIR has been demonstrated . . . it can be done.  A construction access road would work."

Accordingly, "staff is recommending that the Board certify the environmental impact report, and that . . . anything we need to know from all the volumes that were done already on the project, that the modifications ha[ve] resulted in no new or more significant impacts, that any mitigation

15

required for the modifications are already contained in the EIR, no new mitigation measures [are] required."

The Board then heard from a representative of Martha, who had "21 years of experience with this project." During that period, Martha had significantly reduced the scope of the project—"the original 64 acres . . . for potential development has been reduced to 32 acres, so this constitutes a 50 percent less area than what has been approved in the stipulated judgment." Not surprisingly, Martha "concur[red] with the staff recommendation." Nevertheless, Martha objected to "the recommended conditions of approval," deeming many of them "seriously flawed."

The Board then heard from more than 20 speakers, all of whom were opposed to approving the project. After hearing responsive comments from both the consultant and the Martha representative, the Board continued the hearing for two weeks in order that it could be provided more information about specified topics, notably whether "unavoidable significant impacts . . . have been sufficiently addressed by the proposed conditions and mitigation" measures. A recurring theme throughout the hearing was whether specific features of the proposed EIR were consistent with, not forbidden by, or required by, the federal court judgments.

The hearing resumed on October 3. The private consultant working with county planning authorities again opened with "The Court has ordered that this property be approved of 43 houses and lots." During the course of his lengthy remarks, the consultant told the Board that "It was the staff's conclusion based on information provided by the applicant and after peer review of consultants retained by the staff to look at those reports, that . . . the modifications to the master plan proposed by the applicant do not result in any new significant impacts, nor [do] they result in any more severe

significant impacts than those discussed in the [proposed EIR] that you have before you today."

Among those modifications were: (1) Martha was voluntarily proposing to build an access road for the heavy construction equipment the project would require; (2) Martha was voluntarily proposing to "provide public access over private streets . . . that will . . . link with the existing end of Ridge Road and then to connect to the open space" area on the property; (3) Martha was willing to relocate a number of proposed units away from "serpentine bluegrass which is a protected species under the court order"; and (4) the unit relocation, and reduction of their height would preserve an unimpeded view of the ridgeline.

Martha's representative opened his remarks by advising the Board that "The Easton Point master plan provides 32 acres of development area, leaving 78 acres of the site, 71 percent of it, to open space." The remainder of his remarks were directed at the staff recommendation to approve versions of the master plan, and the tentative subdivision map, matters that are not at issue on these appeals.

Martha's counsel and County Counsel spoke to the nature of the federal court judgments. The latter's comments included these ominous words: "This is a very unusual project. Because of the stipulated judgments, you have much less discretion than you normally would in this kind of setting . . . . [¶] It is possible to further lose discretion in this process if we have to go back [to] federal court[] and manage the process that way rather than continuing with the approvals as recommended, so I just want to emphasize that." "All this is to say there is substantial legal risk to the county which also brings with it financial risk in not proceeding with the staff recommendation today."

17

Supervisor Sears stated: "[T]his project has a long and complicated history and court orders that constrained the board supervisors' discretion. I continue to believe that there are important reasons why the proposed project is not right for this location regardless of the reasons for the lawsuit filed by the Martha Company in 1975, or the terms of [the] stipulated judgments of 1976 and 2007, or the federal court . . . intervention that Martha Company sought in 2016. [¶] I am troubled that the court, when it accepted the stipulated judgments and the parties when they agreed to settle the prior lawsuits, did not have the full array of information available now in the EIR."

Supervisor Rice stated: "I do think that we are in a very tight spot, and we don't have a lot of discretion of what to do here, and I'm going to . . . make the motion to . . . approve the EIR. . . . I don't think that we have the grounds [not to] at this point, and I do so feeling sick to my stomach . . . . [¶] I think this . . . is a really difficult place to be, and we are not the . . . [the] first board to have to deal with it, and unfortunately our hands are tied by many decisions made before our time."

For Supervisor Connolly, "really what it's coming down to is my belief that there are profound environmental issues that will never be overcome with this proposal; therefore, I'm not going to be able to support it."

Supervisors Sears, Rodoni, and Connolly expressed the forlorn hope that the property could be purchased so that it could remain in its undeveloped state.

The Board then voted 3 to 2 to certify the Final EIR; to conditionally approve Martha's modified Master Plan of 43 units; and to rezone the property for [this increased density] for the lots Martha would relocate to preserve the ridgeline.

The Board actions most germane to these appeals were (1) the

18

consideration of alternatives to the 43-unit project as proposed by Martha, (2) the conclusion that, with certain exceptions, the significant environmental impacts could be mitigated, and (3) as to those significant environmental impacts that could not be mitigated, the Board adopted a Statement of Overriding Considerations finding that those impacts were subordinated to other factors, which were organized under three headings:

"**Section 1.01  Environmental Considerations and Public Safety Improvements**

"1.  The Project avoids all direct impacts to Marin dwarf flax and serpentine reed grass populations and exceeds the EIR mitigation requirement for a minimum of 3:1 preservation to impact ratio.  The Project also exceeds the 3:1 preservation to impact ratio for overall serpentine bunchgrass habitat as well as complies with the EIR mitigation measures for the California red-legged frog.

"2.  The Project furthers County open space goals through the preservation of approximately 74.75 acres of open space land in perpetuity, which will be managed according to an Open Space Management Plan.

"3.  The Project, including in particular water tank development as well as road and provisions for possible emergency radio improvements, will significantly benefit existing homes in the immediate area by providing improved fire safety.

"4.  The Project incorporates all feasible mitigation measures to reduce potential environmental impacts to the greatest extent practicable.

"**Section 1.02  Legal and Regulatory Considerations**

"1.  The Project will allow for a residential development consistent with the Judgments.  Among other things, the Judgments decree that the owners of the Martha Company are entitled to 43 homes on minimum one-half acre

19

residential lots . . . .

"2.  The Project balances the protection of ecologically sensitive resources with the protection of property rights and the need for housing. The Project represents the best compromise in terms of satisfying the County's obligations under the Judgments and to social, environmental, and housing considerations, all within the constraints of the County's resources.

"3.  The Project ensures that the Martha Company will continue to have economically viable use of the property.  This promotes economic development, spreads public burdens fairly, and protects the County from regulatory takings challenges.

"**Section 1.03  Social Considerations**

"1.  The Project seeks to resolve longstanding legal disputes, negotiations, and deliberations regarding the future use of the Project site.

"2.  The Project supports a balance between housing, environmental preservation and restoration, population growth, and economic development. The Project will expand existing housing within the County, consistent with the CWP [CountyWide Plan], while at the same time maximizing the preservation of open space lands available to public use.

"3.  The Project provides for public use of portions of the Project site in perpetuity, including connectivity adjacent Old St. Hilary's Open Space Preserve lands.

"4.  The Project will substantially improve water supply, fire vehicle access, and possible emergency radio service to a remote Wildland Urban Interface/State of California State Responsibility Area for fire service."

## Proceedings in the Trial Court

Jerry Riessen is one of the property owners, and a dedicated opponent of the proposed development.  The County named him as a party when it

sought to have the 1976 Judgment set aside because he had threatened to sue the County if it approved development of the site in accordance with the 1976 Judgment. Riessen is also the president of the Tiburon Open Space Committee, and twice spoke in opposition to the project before the Board.[11] Exactly one month after the Board's votes, in November 2017, Riessen and the Committee (hereafter, "the private plaintiffs" or simply "plaintiffs") filed a petition for a writ of mandate against the County. [12]

The private plaintiffs opened their single cause of action with the statement that "The County's action paves the way for the development of the single remaining major parcel of open land on the Tiburon Peninsula pursuant to a fatally-flawed EIR that fails to comply with the fundamental dictates of CEQA. A writ of mandate . . . should be issued to prevent this environmental catastrophe from occurring at least until the County fulfills its basic duty of appropriately analyzing and mitigating the extensive significant environmental impacts identified in the EIR and identifying and mitigating the additional impacts not properly disclosed."[13]

---

[11] In addition, at one point in 2011, Mr. Riessen sent comments on the Draft EIR in his apparent capacity as "Co-Chair" of the "Last Chance Committee."

[12] The Committee is described in the petition as "the successor to the Last Chance Committee which was formed in 1988 and was instrumental in preserving Old St. Hilary's Open Space by enlisting widespread community support." The Committee "was formed for the purpose of finding a way to permanently preserve the beautiful and undisturbed open space that is threatened as a result of the certification of the subject EIR."

[13] The "biological-related impacts" were alleged to "include impacts in respect to and/or upon special status plants such as the Marin dwarf flax; the California Red-legged Frog; loss of serpentine bunchgrass; loss of Coast Live Oak Woodlands; disturbance to jurisdictional waters; introduction of invasive exotics; disturbances to active bird nests; and loss of ordinance-sized trees." "Significant visual-related impacts would include impacts in respect to and/or

21

The private plaintiffs alleged that the County's approval was defective in that the EIR was "legally inadequate in numerous respects, and the County's review and approval was legally deficient. Among other things, the EIR fail[ed] to provide an adequate Project description. Significant or potentially significant impacts arising from the Project were not adequately identified, analyzed, or mitigated. [The County] failed to appropriately analyze secondary Project impacts. Mitigation measures imposed on the Project are infeasible, speculative, unenforceable and/or insufficiently reliable. [The County] failed to adequately respond to numerous public comments."

"The EIR failed to disclose significant impacts or, at the very least, a substantial increase in the severity of the impacts it identified. Given the failure fully to disclose impacts, the EIR also necessarily failed to provide a reasonable range of mitigation measures or alternatives to reduce or avoid those impacts."

"The errors and omissions of the EIR resulted in the global failure of the EIR to inform the public or decision-makers of the true scope of the environmental effects of the Project."

Concerning the 1976 and 2207 Judgments, the plaintiffs further alleged: "As a result of the agreements [the County] illegally entered into with [Martha] in connection with the Federal District Court litigation, [the

---

upon fire service, both at the Project level and on a cumulative basis; water service; inadequate fire-flow; and open space." "Significant public services-related impacts would include impacts in respect to and/or upon the view from Tiburon Ridge; the view from Heathcliff Drive; the view from Paradise Drive; the view from Ayala Cove on Angel Island; landslide repair; and light pollution." "In addition, implementation of the Project would result in significant air quality, noise, and cultural resources impacts upon subsurface resources and to the historic significance of Keil Cove."

22

County] unlawfully truncated its review and consideration of Project impacts. The subject agreements were void and against public policy in that, in them, [the County] contracted away its police power in violation of California law. [The County's] decisionmakers on the Board of Supervisors would not have certified the EIR but for the threat of liability arising from the void agreements. [The County's] refusal to consider and/or mitigate Project impacts due to the existence of the void agreements violated CEQA."

Ten months later, in August 2018, the trial court granted the Town leave to file a petition in intervention. As relevant here, the Town's petition largely reiterated the same points and much of what the private plaintiffs had alleged in their petition concerning mitigation measures which lacked the support of substantial evidence.[14]

After examining the administrative record, hearing extensive argument, and filing its exhaustive order denying the petitions (see fn. 1, *ante*), the court entered judgment, from which the plaintiffs and the Town perfected these timely appeals.[15]

## DISCUSSION

### Overview Of CEQA And The Standards Of Judicial Review

Before addressing the particulars of the sometimes intricate and sometimes overlapping arguments advanced by the private plaintiffs and the

---

[14] A major portion of the Town's complaint was devoted to the claims that the Board was required to recirculate the draft EIR, and the Board's decision that recirculation was not required did not have the support of substantial evidence. The Town does not renew these issues here.

[15] The County elected not to file a separate brief, only a joinder to Martha's brief.

Town, we believe it useful to set out a brief description of how CEQA operates.

As a general proposition, CEQA depends on the EIR. "An environmental impact report is an informational document," the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.)[16] According to our Supreme Court: "The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' [Citation.] The EIR is the heart of CEQA, and the mitigation and alternatives discussion forms the core of [an] EIR." (*In re Bay–Delta Etc.* (2008) 43 Cal.4th 1143, 1162.)

"A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. (§§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064, subd. (a)(1).) The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved,

---

[16] Statutory references are to this code unless otherwise indicated. As did the trial court, we will abbreviate citations to the extensive regulations promulgated by the Secretary of the Natural Resources Agency found in title 14 of the California Code of Regulations beginning at section 15000, as "Guidelines" which, we have noted, "are binding upon all state and local agencies in applying CEQA." (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1256, fn. 12.) "In our review, we may not interpret CEQA or the CEQA Guidelines 'in a manner which imposes procedural or substantive requirements beyond those explicitly stated.' (§ 21083.1.)" (*Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1246–1247.)

identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (§§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.)

"The agency must notify the public of the draft EIR, make the draft EIR and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. (§§ 21091, subds. (a), (d), 21092; Guidelines, §§ 15087, 15088.) The agency also must consult with and obtain comments from other agencies affected by the project and respond to their comments. (§§ 21092.5, 21104, 21153; Guidelines, § 15086.) It must prepare a final EIR including any revisions to the draft EIR, the comments received from the public and other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)

"An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (§§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134.) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (§ 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another public agency and have been

25

adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the EIR infeasible, and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects.  (§§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).)  A finding that specific overriding project benefits outweigh the significant environmental effects (§ 21091, subd. (b)) is known as a statement of overriding considerations.  (Guidelines, § 15093.)  [¶] . . . [¶]

"Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process.  The purpose of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1197–1198, fns. omitted.)

Too much should not be expected of an EIR.  It is not to have the exhaustive scope of a scientific textbook.  "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.  An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible.  Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts.  The courts have looked not

26

for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

Much of what goes into an EIR is left to the discretion of the agency preparing it. The leading treatise summarizes: "The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research. [Citations.] An EIR is not required to address all of the variations of the issues presented. [Citation.] An analysis of every permutation of the data is not required." (Kostka & Zischke, Practice Under the California Environmental Quality Act (2d ed. 2022) § 11.28, pp. 11-19–11-20; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*) ["A project opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary"].)

"EIRs shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can rapidly understand the documents." (Guidelines, § 15140.) "Placement of highly technical and specialized analysis and data in the body of an EIR should be avoided." (Guidelines, § 15147.) "Drafting an EIR or preparing a negative declaration necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.)

The judicial attitude to EIRs is deferential. "A court's task is not to . . . determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor [the] scientific expertise to engage in such analysis . . . ." (*Laurel Heights*, *supra*, 47 Cal.3d 376, 393.) It follows that courts "do not require

27

technical perfection or scientific certainty."[17] (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515.)

The scope of judicial scrutiny proceeds along two paths. " 'Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." As a result of this standard, "The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." [Citation.]' [Citation.] 'We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' [Citation.] [¶] 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*In re Bay–Delta Etc., supra,* 43 Cal.4th 1143, 1161–1162.)

"The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. . . . 'A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects

---

[17] Indeed, the preeminent CEQA treatise ruefully notes "EIRs cannot . . . be perfect." (Practice under the California Environmental Quality Act, *supra,* § 11.28, p. 11-20.1.)

have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.' [Citation.] '[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid. Code, § 664.)' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918–919.)

Every court "presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.) Conversely, courts refuse to presume administrative error, still less that it is prejudicial. (§ 21005, subd. (b).) In fact, "errors in the CEQA . . . process which are insubstantial or de minimis are not prejudicial." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 486; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 ["Insubstantial or merely technical omissions are not grounds for relief"].)

Legal error, in the form of failure to comply with CEQA, is reviewed independently, but all factual determinations are reviewed according to the substantial evidence standard. "The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*Bakersfield*

29

*Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)

But a substantial evidence challenge is subject to an important proviso: "As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266; accord, *Sierra Club v. City of Orange, supra,* 163 Cal.App.4th 523, 547.)

**I**

**The County's Compliance With CEQA Was
Not Abdicated Or Compromised In Or By
The 1976 And 2007 Judgments**

The most elemental of the Town's contentions is that the County did not proceed in the manner required by CEQA in that the Board did not exercise the full measure of statutory discretion, the County believing it had no discretion to deviate from the language of the 1976 and the 2007 Judgments. The County's concurrence in those judgments was akin to "contracting away [its] police powers," and such abnegation has long been prohibited in California. The private plaintiffs make essentially the same point: "The County's chief error was its conclusion that its responsibilities under CEQA were subordinate to the stipulated judgments. That is incorrect. The stipulated judgments do not excuse the County's failure to fully comply with CEQA."

A closely related corollary is that Board abused its discretion when it approved the 43 units requested by Martha instead of the "environmentally

30

superior" alternative of only 32 units.  This in turn blends into the argument that the Board's "finding that the environmentally superior alternative [was] infeasible is unsupported by fact and law."

Both of these arguments are predicated in whole or in part on the 1976 and the 2007 Judgments, which are the sun around which the arguments revolve.  These arguments, if well-founded, would obviate the necessity of addressing a greater number of less impactful contentions from the private plaintiffs and the Town.  Because they are quasi-jurisdictional, we take them up first.  Our analysis overlaps—and answers—these arguments.

Language is occasionally found in the briefs insinuating, if not openly declaring, that the County refused to exercise the discretion vested in it by CEQA; or that it ignored CEQA by approving the project "regardless of the environmental impacts"; or that the County stipulated in both the Judgements to "override" CEQA.  Such expressions may be dismissed as hyperbole.  It is, we believe, more accurate to say that the Town and the plaintiffs are claiming that the federal court judgments amounted to an illegal agreement by the County that it would evade or avoid certain parts of CEQA.  At best, in their view, the Board was following only a truncated version of CEQA, one that had a pre-ordained conclusion, namely, that Martha would receive official approval for 43 residences.  And the reason the result was pre-ordained—the reason the Board would never reject Martha's desire to develop the site—was that the Board believed it was constrained by the judgments.  In short, as shown by the various comments made prior to the Board's final approval, the Board felt it was legally compelled by those judgments to approve Martha's 43-unit proposal, and thus never gave the 32-unit alternative a real or fair consideration.  In short, the administrative proceedings were a lengthy and pointless kabuki performance where every

official knew what the final result would be.

This argument, and the subsidiary and corollary claims, are without merit.

"Land use regulations, such as [CEQA], involve the exercise of the state's police power [citation], and it is settled that the government may not contract away its right to exercise the police power in the future." (*Avco Community Developers, Inc. v. South Coast Regional Com*. (1976) 17 Cal.3d 785, 800; see *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 723 ["CEQA confers the duty upon the local lead agency to produce an adequate EIR" and this "statutory obligation[] may not be the consideration for a contract or promise, nor may the County bargain away its constitutional duty to regulate development"]; *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724, ["a local government may not contract away its right to exercise its police power in the future, and land use regulations involve the exercise of police power"].)

As most emphatically and expansively put by our Supreme Court: " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citation.] It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement." (*Mott v. Cline* (1927) 200 Cal. 434, 446.) This is not a California peculiarity, but a national principle. (See, e.g., *Sanitary District of Chicago v. United States* (1925) 266 U.S. 405, 427 and decisions cited ["A state cannot estop itself by grant or contract from the exercise of the police

32

power"] (Holmes, J.).

Although the point has never been authoritatively established by a California court, we assume that another means of nullification that would not be allowed is a claim of ostensible compliance with a settlement agreement reached in federal litigation. (See *Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921 [settlement agreement and stipulated judgment of state litigation held improper curtailment of land use regulations]; *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172 [settlement agreement of state litigation between developer and municipality held improper surrender of zoning power]; *108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186 [settlement agreement and stipulated judgment of state litigation between developer and municipality held not improper surrender of police power]; *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221 [mediation agreement upheld as not surrendering county zoning power]; cf. *League of Residential Neighborhood Advocates v. City of Los Angeles* (9th Cir. 2007) 498 F.3d 1052, 1055 ["A federal consent decree or settlement cannot be a means for state officials to evade state law"].)

It would not be accurate to say that the County—meaning the Board—failed to exercise *any* discretion or completely refused to comply with CEQA in any and all ways. The history of proceedings instantly and decisively refutes the notion. It was implicit in the 1976 Judgment, and explicit in the 2007 Judgment, that an EIR *would* be prepared. As already shown, an EIR *was* prepared, and went through three drafts (see fn.6, *ante*) and extensive revision before it was finally certified. The EIR is almost 850 pages in

length.[18]  It clearly represents a considerable expenditure of both time and money, and not a pro forma exercise.  It is utterly at odds with the conduct of a public entity that believed itself free to blow off CEQA.

Then there is the lengthy administrative process attending the EIR.  As summarized by Martha:  "This process involved extensive public input and participation, including multiple Planning Commission meeting[s] and four public hearings before the Board prior to approval.  At various times during this process, the Board requested additional information regarding the sufficiency of the EIR, feasibility of mitigation, and the layout of the proposed Project.  When it finally acted, the Board made the required findings; confirmed that it exercised its independent judgment in approving the Project, and noted that it retained full discretion to consider and condition subsequent phases of the development process.  Moving forward, in phase two[19] . . . , the County retains discretion to shape the contours of the Project."  To this we add that the Board had aspects of the project examined by additional agencies (i.e., the Marin Municipal Water District, the Tiburon Fire Protection District, and, counting just the years after the draft EIR was finished, administrative proceedings took more than six years.  If the Board truly felt itself free to ignore CEQA, it certainly would have felt itself free of any need to go through such a protracted charade.

Martha, joined by the County, posits an alarming implication to the arguments now pressed by the Town and the private plaintiffs:  "On its face,

---

[18]  "The text of draft EIRs should normally be less than 150 pages and for proposals of unusual scope or complexity should normally be less than 300 pages."  (Guidelines, §  15141.)

[19]  According to Martha, phase two "would include a precise development plan and a tentative subdivision map."

the claim that CEQA somehow displaces the specific provisions of two Federal Judgments is baseless.  CEQA is not nearly so inflexible.  Rather, it recognizes that the scope of environmental review must be commensurate with an agency's retained discretionary authority, including any limitations imposed by legal obligations.  Petitioners' novel framework, under which longstanding legal obligations would become unenforceable when subject to environmental review, would turn California law on its head."

"CEQA . . . recognizes that an agency's discretion is limited by its own legal obligations.  Accordingly, where a legal obligation limits an agency's discretion, the scope of environmental review likewise is limited.  (See, e.g., *Sequoyah Hills Homeowners Association v. City of Oakland* (1993) 23 Cal.App.4th 704, 714–716.)  This is also consistent with CEQA's requirement that an agency exercise its discretionary powers in a manner 'consistent with express or implied limitations provided by other laws.' (Guidelines, § 15040, subd. (e) . . . .)  Where a lead agency's discretion already is limited by legal obligations, therefore, the scope of environmental review adjusts in relation to the amount of discretion. . . .

"Accordingly, an EIR must reflect any applicable legal obligations that limit the agency's discretionary authority, and thus the scope of review.  And while CEQA imposes a duty on lead agencies to avoid or mitigate significant environmental impacts caused by projects, such duty exists only to the extent *feasible*.  (§§ 21002, 21002.1, subd. (b)[20] . . . .)  Mitigation measures that

---

[20]  "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which

35

conflict with legal obligations are legally *infeasible* and 'need not be proposed or analyzed.'  (Guidelines § 15126.4, subd. (a)(5); see also § 21004.) Alternatives that conflict with obligations also are legally *infeasible* and need not be analyzed.  (Guidelines § 15126.6, subd. (a) ['An EIR is not required to consider alternatives which are infeasible . . . '].)

"CEQA also gives lead agencies the authority to approve a project notwithstanding certain environmental impacts if:  (1) it is not feasible to lessen or avoid the significant effects . . . and (2) the identified benefits of the project outweigh the unavoidable, significant environmental impacts (§ 21081[21] . . . )."

---

will avoid or substantially lessen such significant effects.  The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."  (§ 21002.)

"In order to achieve the objectives set forth in Section 21002, the Legislature hereby finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to this division:  [¶]  . . .  [¶]  (b)  Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.  [¶]  (c)  If economic, social, or other conditions make it infeasible to mitigate one or more significant effects on the environment of a project, the project may nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations."  (§ 21002.1.)

" 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."  (§ 21061.1.)  The Guidelines add "legal" as another factor.  (Guidelines § 15364.)

[21]  "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:  [¶]  (a)  The public agency makes one

Having already seen that the Board cannot be accused of ignoring CEQA, it now appears that the Board was proceeding along lines that are in fact expressly embedded in CEQA. A statement of overriding considerations—which is the finding described in subdivision (b) of section 21081—is to be used in situations where the public agency deems a project sufficiently important or desirable for reasons that override the normal obligation to mitigate significant environmental effects. One of those statutory reasons allows for considerations, conditions, or factors that are "legal." (§§ 21081, subds. (a)(3), (b), 21002.1, subd. (b); Guidelines § 15364.)

Martha has seized on the essential point. This is not a situation where a government entity has agreed to exempt a class of applicants or has quit a particular regulatory field. (Cf. *County Mobilehome Positive Action Com., Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727 [County improperly enacted ordinance declaring it would not enact a type of land use regulation for 15 years].) The County did not condition the exercise of its authority upon the agreement of other governmental entities, thus giving those entities actual control or veto power. (*County of Ventura v. City of Moorpark* (2018) 24 Cal.App.5th 377; *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716.) It did not "agree to refrain from legislating in

---

or more of the following findings with respect to each significant effect: [¶] . . . [¶]

(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.

(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (§ 21081.)

the future on the matters that are the subject of the Stipulated Judgment[s]." (*108 Holdings, Ltd. v. City of Rohnert Park*, *supra*, 136 Cal.App.4th, 186, 195.) The County did not agree to approve a project it knew was incompatible with its general plan (*Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765), or agree to give a developer an exemption from zoning laws, as occurred in *Summit Media LLC v. City of Los Angeles, supra*, 211 Cal.App.4th 921. It is not a situation where an otherwise valid agreement has been rendered invalid by subsequently enacted legislation.

What we have here is simply a single project with a particular set of attending circumstances, one of which is concluded litigation. There is nothing intrinsically suspect about a governmental entity settling a lawsuit brought by a property developer. Quite the contrary, the law favors and encourages the settlement of legal disputes. (E.g., *Salmon Protection & Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195, 201.) Indeed, the practice as applied to property development disputes is common and has been approved by our Supreme Court. (*Pardee Construction Co. v. City of Camarillo* (1984) 37 Cal.3d 465; accord, *108 Holdings, Ltd. v. City of Rohnert Park*, *supra*, 136 Cal.App.4th 186, 195, 197.) Moreover, although it may look a bit like putting the cart before the horse, a lead agency can commit to a project before completing a thorough environmental review. (*Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549 (*Saltonstall*).)

Conspicuously absent from the briefs of the Town and the private plaintiffs is discussion about the actual legal force of the federal court judgments, and the scope of what may be properly settled. By focusing on the issue of the 32-unit alternative, the Town and the plaintiffs plainly believe that the 1976 and 2007 judgments could and should have been ignored. In other words, the judgments were of no consequence whatsoever, except as a

target for opprobrium. But this current attitude is belied by their past conduct.

The 1976 Judgment was not an abandoned derelict that suddenly loomed out of the fog. The efforts of the Town and the private plaintiffs to have it vacated demonstrate that they knew it was a dagger pointed at the heart of their campaign to defeat entirely any development of the site or, failing that, to minimize the extent of any development.

However, the judgments clearly did exist and did have consequence. The doctrines of res judicata or collateral estoppel may be put to one side.[22] The language of the judgments has been quoted and that language requires no elucidation. Twice, the County pledged its name and good faith in accepting that Martha would be allowed to build at least 43 units on lots of at least one-half acre. To judge from the County Counsel's remarks to the Board, it may safely be assumed that the County acceded to the 1976 Judgment in recognition that its 1974 re-zoning attempt exposed it to significant monetary liability. Certainly, no one would question Martha's natural inclination to take the judgment at face value, believing the County's word was good. (Cf. "If parties cannot rely on a stipulated judgment, there is no certainty in any document." (*Pardee Construction Co. v. City of Camarillo*, *supra*, 37 Cal.3d 465, 473 (dis. opn. of Mosk, J.).)

---

[22] The trial court also concluded that the Town and the private plaintiffs were barred by collateral estoppel to question the 2007 Judgment, a conclusion both contend was erroneous. As we reject the merits of their substantive challenge, we have no need to consider whether they are precluded from presenting that challenge. For the same reason, we do not examine Martha's argument that if plaintiffs and the Town are making "CEQA challenges *to* the Federal Judgments" (italics added), they are precluded from doing so because such claims are untimely (§ 21167, subd. (a) [180 days to commence action]), and are thus time-barred.

39

The 2007 Judgment added only one matter to the issues addressed in the 1976 Judgment—the County's acknowledgement that "any development alternative, or any proposed mitigation measure, which does not accord Martha all rights to which it is entitled under the 1976 Judgment is legally infeasible." Yet this addition did not change the essence of the County's CEQA responsibilities.

The preparation of a "full-scale" EIR has already been mentioned. Almost all of the details—in the language of the 1976 Judgment, "including but not limited to, esthetics, protection of ridge lines, environmental factors, traffic generation and community services impact" (see fn. 3 and accompanying text, *ante*)—were left to the administrative process. The ensuing administrative proceedings were protracted, laborious, and anything but rushed, perfunctory, or short-circuited.

Granted, the 1976 and the 2007 Judgments did have the effect of deciding what was for Martha's opponents *the* most important issue, namely, whether they could continue to prevent any and all development of the site. That decision was not the result of haste or secrecy.

CEQA is in large part designed to ensure political responsibility. As the late Presiding Justice Sills vividly put it, CEQA provides "protections . . . to expose elected decisionmakers to the political consequences of any decision to certify an EIR. There is a sort of grand design in CEQA: Projects which significantly affect the environment can go forward, but only after the elected decisionmakers have their noses rubbed in those environmental effects, and vote to go forward anyway." (*Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 530; see *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286 [a central purpose of CEQA is to " '[d]isclose to the public the reason why a government agency approved the

40

project in the manner the agency chose,' " quoting Guidelines § 15002, subd. (a)(4)]; *Laurel Heights*, *supra*, 47 Cal.3d 376, 392 ["the EIR . . . is a document of accountability" and "the public will know the basis on which its responsible officials either approve or reject environmentally significant action . . . . The EIR process protects not only the environment but also informed self-government"].)

Our decision in *Sequoyah Hills Homeowners Association v. City of Oakland*, *supra*, 23 Cal.App.4th 704, is unusually instructive. There, a local agency felt it was compelled by state law to approve a 45-lot residential project because "the City Council determined that Government Code section 65589.5, subdivision (j), prevented it from requiring the developer to lower the project density." (*Id*. at p. 712.) We held the council did not abuse its discretion when it concluded that decreased density alternatives—including one for 36-residences—were legally infeasible. (Id. at pp. 714–716.)

If a state statute can render less dense alternatives legally infeasible, no reason in law or logic prevents a final federal court judgment from having the same impact.

Our decision in *Sequoyah Hills Homeowners Association* also prompts a cautionary observation. Of course, a local agency cannot simply intone the words "legally infeasible" and expect that will be the end of the matter. What is "legally infeasible" clearly smacks of a legal conclusion, a subject courts are prone to reserve to themselves. (See *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 355–356; but cf. *id*. at p. 368 ["If we agreed with the Trustees that mitigation were [legally] infeasible for the reasons given in the findings, . . . we would give much deference to the Trustees' weighing of the project's benefits against the remaining environmental effects"].) In short, the local agency that labels an

alternative "legally infeasible" should not be surprised if that conclusion is challenged in court. (See *id.* at pp. 356–362, where the Supreme Court concluded the lead agency had erroneously determined that mitigation was legally infeasible on the ground that the agency was legally prohibited from contributing to the mitigation costs; *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 636–637 [municipal infeasibility determination supported by substantial evidence].) Here, however, the Board's conclusion that the stipulated judgments made it "legally infeasible" to approve less than 43 residential lots has survived scrutiny by state and federal courts.

With this conclusion, the subsidiary arguments fall accordingly.

Start with the plaintiffs' argument that "A federal court stipulated judgment cannot override valid state laws in the absence of findings that a violation of federal law has occurred and that overriding state law is required to remedy the violation," and no such findings were made in connection either the 1976 or the 2007 judgments. However, such a finding has a condition precedent: "Before approving any settlement agreement that authorizes a state or municipal entity to disregard its own statutes in the name of federal law, a district court must find that there has been or will be an *actual* violation of that federal law." (*League of Residential Neighborhood Advocates v. City of Los Angeles*, *supra*, 498 F.3d 1052, 1058.) Here, the district court never made a finding that federal law was, or was about to be, broken. Moreover, as already shown, the court in 2018 made clear beyond any doubt that it did *not* read the judgments as requiring violation either state law in general or CEQA in particular.

Next, relying on *Keith v. Volpe* (9th Cir. 1997) 118 F.3d 1386, the Town and the private plaintiffs assert that "a stipulated judgment that purports to

42

compel a violation of state law, but does not identify any violation of federal law that warrants overriding state law, will not be enforced by a [federal] court in a subsequent proceeding." Again, the condition precedent is absent: the district court in 2018 clearly determined that the stipulated judgments did not "purport[] to compel a violation of state law," but were on the contrary respectful of preserving state law.

Then there is the Town's claim that the ordinary presumption that "official duty has been regularly performed" (Evid. Code, § 664) should be deemed rebutted for purposes of our review, obliging us to adopt a more critical scrutiny. The Board's conclusion, however reluctant, that it was bound by the stipulated judgments, does not demonstrate that the supervisors were not regularly performing their official duty. Recognizing unpleasant realities is often the essence of official duty for elected office-holders.

Finally there is the private plaintiffs' claim that the "EIR findings are not supported by substantial evidence." Actually, they aim their fire at only one finding, namely, the finding required by CEQA that when certifying an EIR the lead agency must make a finding that the certification "reflects the independent judgment of the lead agency." (§ 21082.1, subd. (c)(3).) The plaintiffs reason that unless the Board could ignore the stipulated judgments, it could not exercise an "independent judgment."

To state this conclusion is to refute it. If a lead agency could only exercise independent judgment by disregarding a binding final judgment, so equally could it be said that the agency could only exercise a true independent judgment if it was free to disregard provisions of CEQA that prove inconvenient.

In conclusion, as already noted, a central purpose of CEQA is to

43

" '[d]isclose to the public the reasons why a governmental agency approved the project in the manner the agency chose.' " (*Tomlinson v. County of Alameda, supra*, 54 Cal.4th 281, 286)  The draft EIR did that, in spades. Some members of the Board clearly felt they had been maneuvered into approving the project, but the means of the maneuver were on the record, in the EIR, and clearly a matter of common knowledge.  But not liking the deal struck in 1976 and again in 2007 was no ground for repudiating it.

## II

## The EIR's Project Description

We next take up a contention of the private plaintiffs because it is the only true response to the County's argument that the Board was correctly operating with a reduced scope of its normal discretion under CEQA.  The plaintiffs' response comes in context of their attack on a part of the EIR that seldom generates controversy.

"A [draft] EIR must include a project description.  [Citation.]  The project description must contain (1) the precise location and boundaries of the proposed project; (2) a statement of the objectives sought by the proposed project, including the underlying purpose; (3) a general description of the project's technical, economic, and environmental characteristics; and (4) a statement briefly describing the intended uses of the EIR.  (Guidelines, § 15124.)  The description should not, however, 'supply extensive detail beyond that needed for evaluation and review of the environmental impact.'  [Citation.]  The description must include the entirety of the project, and not some smaller portion of it.  [Citations.]

" '[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.'  [Citation.]  'Only through an accurate view of the project may affected outsiders and public decision-makers

balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.' [Citation.] A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading. [Citation.] Further, '[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input.' [Citation.] 'Whether an EIR correctly describes a project is a question of law, subject to de novo review.' " (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332.)

The private plaintiffs assert that the EIR's project description was "unduly narrow" and this "caused the County to act inconsistently with CEQA and other state law." Citing *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, the plaintiffs reason: "As in *North Coast Rivers Alliance* . . . , the County's unlawfully-truncated environmental review process began at its very inception—with an impermissible and 'artificially narrow' Project description in the DEIR [Draft EIR]. According to the County's findings the purpose of the EIR was to conduct an 'analysis of the 1976 Court Judgment that 43 minimum half-acre lots be approved on the subject property.' Thus, the opening lines of the DEIR stated that [Martha's] land use application was filed 'in reliance' on the stipulated judgments, 'which determined that the development of the project site with a minimum of 43 single-family residential units on minimum one-half acre lots would be consistent with the goals of the *Marin Countywide Plan*.' . . . [¶] That artificially narrow Project description[] caused the County to act inconsistently with state law by refusing to exercise its discretion and police powers and failing to comply with CEQA."

45

It is apparent that this argument is not really directed at the project description that is in the EIR, but is simply a variation on the theme that the County "abdicated" its responsibilities under CEQA by complying with the stipulated judgments, an argument we have already rejected. Here, too, the private plaintiffs assume that the judgments can be put to one side, that they have no validity, that they should have been ignored. That assumption is the predicate of this argument. It has already been shown that the predicate is unfounded. The latest argument falls with the predicate.

We add only a few brief comments about the actual projection in the Draft EIR.

As already noted, the project description need only disclose "the nature of the project" (*South of Market Community Action Network v. City and County of San Francisco*, *supra*, 33 Cal.App.5th 321, 332) and its "main features." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 28.) In addition , "[t]he degree of specificity required depends on the type of [the] project." (*Ibid*.)

Here, the type and nature of the project are unmistakably straightforward—the construction of 43 suburban single-family residences. The main features, that is, "the project's technical, economic, and environmental characteristics" (Guidelines, § 15124, subd. (c)), are generally what one would expect from constructing a suburban housing subdivision. The only significant wrinkle are some topographical features, also to be expected from building houses on a mountain. The relevant Guideline requires that "[t]he precise location and boundaries of the proposed project shall be shown on a detailed map, preferably topographic. The location of the project shall also appear on a regional map" (Guidelines, § 15124, subds. (a) & (c)), which was done here. It also requires a "general description of the

46

project's technical, economic, and environmental characteristics, considering the principal engineering proposals" (*id*, subd. (c)), which was also done— indeed, with considerable detail.[23]  Beyond that, CEQA allows for environmental effects which are based on, or related to, topography or other physical features of the project site, to be addressed elsewhere in the EIR.

The CEQA requirement of only a "general description" that eschews "extensive detail" is hard to square with the project description in the final Draft EIR.[24]  As best we can tell, no one ever complained that the project description had significantly more detail than required.  It may reflect nothing more than the length of this dispute, and the passions involved, in the age of word processing.  However, given the voluminous detail, an actual attack on the adequacy of the project description would almost certainly qualify as frivolous.

---

[23]  The number of residential units was provided, together with lot sizes and locations.  The same was true for the parcels comprising "public open space and trails."  None of the houses could exceed two stories and "should be designed to visually blend with the surrounding topography to minimize the prominence of structural height, bulk, and massing as viewed from surrounding properties and roadways."  Fencing and exterior lighting would be minimized, and night lighting for recreational purposes would be prohibited.  New paved driveways, and the number of "off-street parking spaces" for each lot are described.  Sewers and the "Grading and Drainage Plan plus a Stormwater Control Plan" are discussed, as are "Erosion Control" and "landslide Repair."  Three pages were devoted to "Grading" and "Retaining Walls."

[24]  The Project Description was 22 pages in the 2001 DEIR, but it increased to 34 pages in the 2011 final DEIR.

It is one of the ironies of CEQA in operation that the EIR, prepared and paid for by the developer of the proposed project, ends up being more comprehensive than absolutely required by CEQA.  The very completeness of a draft EIR may simply produce more targets for opponents of the project to attack.

# III

## The EIR's Analysis Of Reasonable Alternatives
## Was Not Deficient

The Town and the private plaintiffs tell us that the County abused its discretion by rejecting the 32-unit alternative as inconsistent with the Judgments. The plaintiffs further insist that "the County abused its discretion by limiting its selection and consideration of alternatives in light of the supposed limitations of the stipulated judgments."

This is yet another way attempt to evade the stipulated judgments. It too will fail.

To reiterate, the statutory command is that "it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives . . . which would substantially lessen the significant environmental effects of such projects, . . . [T]he procedures required by this division are intended to assist public agencies in systematically identifying . . . the feasible alternatives . . . which will avoid or substantially lessen such significant effects." (§ 21002.) However, as already established, "feasible" is a flexible concept that can outrank and overpower what might otherwise qualify as alternatives to the proposed project.

"The lead agency is responsible for selecting a range of potential alternatives for examination and must publicly disclose its reasoning for selecting those alternatives." (Guidelines, §§ 15126.6, subd. (a).) "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (*Ibid.*) The "rule of reason" requires an EIR "to set forth only those alternatives necessary to permit a reasoned choice." (*Id.* § 15126.6, subd. (f); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 ["CEQA establishes no categorical legal imperative

as to the scope of alternatives to be analyzed in an EIR.  Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose"]; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 999 ["While it is up to the EIR preparer to identify alternatives as potentially feasible, the decision-making body 'may or may not reject those alternatives as being infeasible' when it comes to project approval. . . .  Like mitigation measures, potentially feasible alternatives 'are suggestions which may or may not be adopted by the decisionmakers' "].)

A "feasible" alternative is one that could accomplish "most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects."  (Guidelines § 15126.6, subd. (a).)  We will uphold an agency's choice of alternatives unless they "are manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265.)

We confess to a slight puzzlement at all the sound and fury attending the 32-unit alternative because it could legitimately have been omitted from the EIR.[25]  From the principle that an EIR need only discuss alternatives

---

[25]    Even so, there does appear to be an explanation for why the 32-unit alternative was included—because the Town had agreed not to oppose construction in that number.  A letter from the Town to the County has this: "In 2009, after long and careful discussion the Town and the Martha Company entered into a Memorandum of Understanding . . . in which they agreed to support a reduced density 32-unit alternative to the 43-unit project. . . .  [T]he Town committed to support that alternative."  This agreement is mentioned in the final responses to the Draft EIR.

Apart from Judge Chou's reference to it as having "expired," there is nothing in the record explaining why the Town's agreement with Martha was taken off the table, and there is nothing in the Town's briefing hinting at any

that are feasible, it follows that "infeasible alternatives that do not meet project objectives need not be studied even when such alternatives might be imagined to be environmentally superior." (*Saltonstall*, *supra*, 234 Cal.App.4th 549, 576.)  With the County legally bound to a 43-unit minimum, any alternative with fewer units would, as already shown, be legally infeasible.  It was not an abuse of discretion for the Board not to choose a legally infeasible alternative.

IV

**The Board's Findings That Certain Significant Environmental Impacts Could Be Mitigated**

**A.  Mitigation Of Traffic Safety**

According to the Town, "No evidence supports the County's finding that the project's impact on traffic safety in Town neighborhoods will be mitigated to a less-than-significant level."  The Town also objects to it being required to shoulder the burden of making the mitigation measure feasible by changing its (the Town's) law.[26]  This is what the County decided:

"**IMPACT 5.1-10:  Project Traffic Added to Lyford's Cove/Old Tiburon and Hill Haven Neighborhood Streets**

"**—Accident Records, Emergency Access and Traffic Flow**

---

connection with the number 32.  The answer may be simple arithmetic—why should Martha settle for 32-units when it could have 43?

[26]  The Town argues that "because the County failed to address additional mitigation measures proposed during the administrative process, the County violated CEQA."  This single sentence merits no further mention. (See Cal. Rules, of Court, rule 8.204(a)(1)(B)-(C) ["Each brief must:   [¶] . . . [¶]  State each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority; and  [¶]  Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

"*Facts*:

"The EIR found that long-term project traffic (all post-construction traffic) added to Lyford's Cove/Old Tiburon and Hill Haven neighborhood streets would not result in significant impacts to existing or future roadway capacity. However, emergency vehicles and residents of these existing neighborhoods would be exposed to more frequent unpredictable traffic flow and intermittent safety hazards when traveling on the narrow, winding residential streets. This is a potentially significant impact. . . .

"*CEQA § 21081(a) Finding*:

"Finding # 2: Another public agency can and should mitigate the impact.

"*Evidence Supporting the Finding*:

"The residential streets in the Lyford's Cove/Old Tiburon and Hill Haven neighborhoods are under the jurisdiction of the Town of Tiburon. Mitigation Measure 5.1-10 recommends the Town prohibit the parking of dumpsters along Lyford's Cove/Old Tiburon and Hill Haven neighborhood streets to reduce the interruption of traffic flow on a regular basis and during an emergency. This would effectively prohibit the parking of dumpsters along streets narrower than 28 feet wide. Tiburon's implementation of mitigation measure 5.1-10 would reduce the impact to less than significant.

"**Adopted Mitigation Measure**:

"5.1-10 prohibits parking dumpsters along Lyford's Cove/Old Tiburon and Hill Haven neighborhood streets.

"The Board hereby adopts and makes a condition of approval Mitigation Measure 5.1-10."

"**IMPACT 5.1-13: Construction Traffic Impacts**.

"*Facts*:

51

"The EIR found that the Project could add significant amounts of construction traffic to Paradise Drive, adding to the existing sight distance safety concerns at the Paradise Drive/Forest Glen Court intersection, and raising safety concerns about construction truck use of Paradise Drive (related to tight curves and narrow segments of the roadway where large trucks would wander into the opposite direction travel lane). Construction trips also would damage pavement on affected roads and have the potential to disrupt the residential environment. . . .

"*CEQA § 21011(a) Finding*:

"Finding # 1: This impact is mitigated to a less-than-significant level.

"*Evidence Supporting the Finding*:

"The conditions of master plan approval require the submittal of a Construction Management Plan with the precise development plan/tentative map application. The Construction Management Plan shall:

"Prohibit construction vehicles/activity within existing residential neighborhoods except as necessary for Lots 1, 2, and 3.

"Control all uses of the proposed temporary construction access roadway as a constant safety precaution.

"Implement all project traffic control elements including consolidation of approved routes, informing residents of construction activities and duration, and using flag persons and flag trucks along construction routes.

"Initial improvements to Paradise Drive and Forest Glen Court to enhance traffic safety during construction.

"Include provisions in contractors' construction contracts to prohibit parking of construction vehicles anywhere other than on-site.

"Precautions in the event of construction traffic queuing on Paradise Drive.

"Repair of any deteriorated pavement along Tiburon Drive-Paradise Drive identified by a before and after pavement evaluation program.

"Obtain County and Town approval for construction truck haul routes and establish haul truck hours for project construction traffic.

"The conditions of master plan approval also require the applicant implement all measures regarding the construction access road as proposed by Ghilotti Construction Company and Red Horse Constructors, Incorporated, including:

"Installation of some type of barrier (Temporary K-Rail, Metal Beam, Guard Rail, etc.) to be securely anchored to the outboard and downward edges of all road curves.

"Provide for the installation of an emergency stop/crash cushion array located in the center of the Forest Glen cul-de-sac.

"One-way radio-controlled access to be maintained during construction activities.

"Erect construction speed limit signs, adopt access protocols and emergency vehicle access procedures.

"Provide a secured and controlled access point to assist in traffic control during construction hours and security of the site in off hours.

"Establish speed limits for construction traffic and penalties for non-compliance in contractor contracts.

"Prohibit construction vehicle queuing in an active travel lane; shoulder areas wide enough for stacking of construction traffic shall be provided prior to commencement of construction activities.

"**Adopted Mitigation Measures**

"5.1-13(a) requires the applicant to implement all measures regarding the construction access road as proposed by Ghilotti Construction Company

and Red Horse Constructors, Inc., as well as additional safety measures provided in the November 17, 2011 W-Trans report.

"5.1-13(b) requires implementation of the Construction Management Plan with certain specified modifications that: (1) prohibit construction vehicles/activity within existing residential neighborhoods except as necessary access for development of Lots 1, 2, and 3; (2) control all uses of the proposed temporary construction access roadway as a constant safety precaution; (3) implement all Project traffic control elements; (4) initial improvements to Paradise Drive and Forest Glen Court to enhance traffic safety during construction; (5) include provisions in contractors' construction contracts to prohibit parking of construction vehicles anywhere other than on-site; (6) precautions in the event of construction traffic queuing on Paradise Drive; (7) repair of any deteriorated pavement along Tiburon Drive-Paradise Drive identified by a before and after pavement evaluation program; (8) obtain County and Town approval for construction truck haul routes and establish haul truck hours for project construction traffic; (9) establish speed limits for construction traffic and strict speed enforcement measures; and (10) prohibit construction vehicle queuing in an active travel land; shoulder areas wide enough for stacking of construction traffic should be identified prior to commencement of construction activity.

"The Board hereby adopts and makes a condition of approval Mitigation Measures 5.1-13(a) and 5.1-13(b)."

The Town calls this mitigation measure "unenforceable," "illusory," and supported by no evidence.

The fact that mitigation must take place in Tiburon is an undeniable jurisdictional fact, but not an insurmountable obstacle. CEQA is not blind to the possibility of multiple jurisdictions or agencies having some degree of

54

involvement or responsibility for a project. Mitigation may be within the jurisdiction of another entity, and a project may be approved with a finding that a mitigation measure "should be[] adopted" by another entity that has exclusive jurisdiction. (§ 21081, subd. (a)(2); *City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th 341, 366; Guidelines § 15091, subd. (a)(2).) "[S]peculation a municipality might not agree . . . is not sufficient to show the agency violated CEQA by adopting [the] mitigation measure."[27] (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th 439, 466.)

The EIR makes clear that the streets in question are not your standard streets, and why so little could be done to improve matters: "Lyford's Cove/Old Tiburon and Hill Haven neighborhood streets are described . . . as narrow and winding. The older streets . . . are less than 24-feet wide. This width is not sufficient for two-way traffic if there is on-street parking. Newer streets are 24 feet wide, meeting the Town's minimum standard for public residential roads. This width is sufficient for two-way traffic flow with no on-street parking, but only minimally adequate for two-way flow with parking permitted on one side only. However, if parking is permitted on both sides,

---

[27] Although the Town asserts "the proposed dumpster ban is not enforceable because there is no evidence that the Town will amend its existing ordinances—which already subject dumpsters to a permit process," actual legislation is not necessarily contemplated or required. Although the language of Impact 5.10 quoted above speaks of the Town "prohibiting" dumpsters, such could be administratively accomplished through the permitting process.

At another point in its brief the Town states it "has expressly disclaimed any intent to ban street parking or dumpsters in the Lyford's Cove/Old Tiburon and Hill Haven neighborhoods," but the supporting evidence is from Town staff and goes no farther than predicting that official action is "unlikely." Such expressions are hardly a categorical refusal to take any positive action, legislative or administrative.

when cars are parked opposite each other, the 24-foot width is not sufficient for two-way traffic flow.  At such times the road only accommodates a single travel lane (alternating one-way flow). . . .  [T]he road deficiencies are well-known to residents who must cope with the narrow road widths on a daily basis. . . .  Residents responding to the Notice of Preparation for this EIR . . . cited numerous ongoing problems with access through the existing neighborhoods. . . .  [¶]  At least eight letters detail existing problems experienced by residents with homes served by Hill Haven neighborhood and Lyford's Cove/Old Tiburon neighborhood roads.  Identified problems include existing narrow roads obstructed by maintenance trucks and [trash] *dumpsters.*" (Italics added.)

This is not an isolated point.  Elsewhere in the EIR is this:  "For example, along a very narrow segment . . . a haul truck and dumpster (about ten feet by teen feet in size) were observed parked on-street, reducing the road to one narrow lane."  And this:  "Keeping *all routes* unobstructed is critical to allow the maximum flow of two-way traffic.  This is the reason for the Draft EIR mitigation that dumpsters not be placed in the travelway."  Most decisively, "There are no other clear solutions."

So, the situation appears to be as follows:  We are dealing with an area with narrow winding streets that are barely able to handle existing traffic.  The Town concedes in its brief that the existing roads are already "insufficient for two-way traffic with parking permitted on one or both sides of the street."  The existing roads cannot be widened.  For all practical purposes, the area is completely developed.  Space is at a premium.  There are no sidewalks.  Parking is not entirely prohibited, but the Town is attempting to introduce "No Parking" areas, notwithstanding "inconvenience to residents who rely on the availability of the on-street parking."  The

options for mitigation are clearly limited.  (Neither the private plaintiffs nor the Town suggest a more efficacious alternative.)[28]  The option of prohibiting dumpsters had some public support.

Although in its brief the Town decries that the County adopted "just one measure (MM 5.1-10) to mitigate this significant impact," this is not

---

[28]  This silence has considerable significance.  The leading treatise on CEQA summarizes:  "An EIR must describe feasible measures that could minimize the project's significant adverse impacts.  [Citation.]  An EIR may decline to propose a mitigation measure that would not effectively address a significant impact.  [Citation.]  An EIR also need not identify and discuss mitigation measures that are infeasible.  'Nothing in CEQA requires an EIR to explain why certain mitigation measures are infeasible.'  [Citation.]  Nor must an EIR analyze in detail mitigation measures it concludes are infeasible. . . .  [¶] . . . [¶]  An EIR must respond to comments making specific suggestions for mitigating a significant impact unless the suggested mitigation is 'facially infeasible.' . . .  When comments suggest additional mitigation and are supported by expert opinion or technical evidence, the EIR must provide a detailed evidence-based response."  (Practice under the California Environmental Quality Act, *supra*, § 14.10, pp. 14-13 –14-14.)

The Town points to no mitigation measures that it or others suggested would reduce the impact of traffic (or the other impacts it claims are inadequately mitigated).  That means that the mitigation measures imposed by the County stand alone, there being no discussion of alternative measures that were rejected.  The consequence is that parties challenging a certified EIR are able to simply say that an adopted mitigation measure is ineffective or not good enough.  But unless there is a record of alternatives, with supporting information showing greater effectiveness, such an approach places courts in an uncomfortable if not untenable position.  Aware that we lack the scientific expertise and are "not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated" (*Laurel Heights*, *supra*, 47 Cal.3d 376, 393), how do courts evaluate a claim that a mitigation measure is ineffective when there is nothing in the record showing the existence of a more effective measure?  Given the normal appellate presumptions of regularity, plus deference to the local agency's decision, how are courts supposed to determine whether a measure will not truly mitigate, or whether other measures would better mitigate?

entirely accurate.  Mitigation Measures 5.1-13(a) and 5.1-13(b), already quoted, are clearly pertinent to the issue, and should be considered.  Viewed in their entirety, the measures aim at a comprehensive approach to the problem.  Traffic cannot be banned, but it can have obstructions removed or reduced.  Traffic speed will be regulated as to time, density, hours of traffic generated by the project.

A certified EIR is only required to have " 'a reasonable plan for mitigation.' " (*City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th 341, 365; see *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 843 ["an EIR must only consider 'a reasonable range of . . . mitigation measures' "].)  The CEQA treatise, distilling dozens of reported decisions, states:  "The courts have generally deferred to an agency's assessment of the effectiveness of the mitigation measures proposed in an EIR."  (Practice Under the California Environmental Act, *supra*, § 14.9, p. 14-9.)  And we repeat the words of our Supreme Court:  "A court's task is not to . . . determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated.  We have neither the resources nor [the] scientific expertise to engage in such analysis . . . ." (*Laurel Heights*, *supra*, 47 Cal.3d 376, 393.)

From our non-scientific perspective, we see the County confronting an existing difficulty that could have only imperfect mitigation.  The response was a good faith attempt to reduce and/or buffer the anticipated traffic consequences of the project with " 'a reasonable plan for mitigation.' " (*City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th 341, 365.)  Accordingly, we must reject the Town's attempt to overthrow the Board's decision on this point.

## B.  Traffic Density

The private plaintiffs contend that "Substantial evidence does not support the EIR's traffic study given the failure to study peak hour traffic." This is what the County decided:

"**IMPACT ANALYSIS**

"**Impact 5.1-1  Existing-Plus-Project Impacts on Study Intersections**

"Project traffic would increase traffic volumes at study intersections along Tiburon Boulevard and Paradise Drive.  This would be a less-than-significant impact.

"**EXISTING-PLUS-PROJECT CONDITIONS**

"Project-generated trips were added to existing weekday AM and PM peak hour volumes to obtain existing-plus-project volumes.  The resulting existing-plus-project traffic volumes are shown in Exhibits 5.1-21 through 5.1-24.

"Exhibits 5.1-25 and 5.1-26 present the existing-plus-project levels of service at all study intersections.  Project traffic added to existing volumes on Tiburon Boulevard would result in the following:

"At signalized intersections currently operating acceptably, the addition of project traffic would not result in an unacceptable level of service operation.

"At the one un-signalized intersection with side street left turns currently operating unacceptably in both the AM and PM peak hour (Reed Ranch Road/Tiburon Boulevard), the addition of project traffic volumes would not result in meeting the signal warrant #3 criteria levels.  Exhibit 5.1-27 shows the result of signal warrant evaluation.

"**Mitigation Measure 5.1-1**  No mitigation would be required."

59

"**POTENTIALLY SIGNIFICANT IMPACTS MITIGATED TO A LESS THAN SIGNIFICANT LEVEL**

"**Impact 5.1-2: Cumulative Buildout-Plus Project Impacts to Study Intersections**

"<u>Facts</u>

"The EIR found that Cumulative-plus-project conditions would increase peak hour traffic volumes at all study intersections. With planned improvements, all but three study intersections would operate acceptably with or without the project, during the AM and PM peak hours: The signalized Avenida Miraflores/Tiburon Boulevard intersection, the signalized Rock Hill Drive/ Tiburon Boulevard intersection, and the un-signalized Reed Ranch Road southbound left turn to Tiburon Boulevard. The impact is discussed on 218–227 of the D[raft]EIR.

"<u>CEQA § 21081(a) Finding</u>

"Finding #1: This impact is mitigated to a less-than-significant level.

"<u>Evidence Supporting the Finding</u>

"Based upon the EIR and the entire record, this traffic impact is mitigated to a less-than-significant level by the imposition of Mitigation Measures 5.1-2, 5.1-2(a) & 5.1-2(b) because the applicant would pay a pro-rated share of planned improvements and payment in full for unplanned improvements to mitigate cumulative traffic impacts at these intersections.

"Conditions of project approval require the applicant to pay a pro-rated share of planned lane improvements at the Redwood Highway Frontage Road/Tiburon Boulevard intersection and Trestle Glen/Tiburon Boulevard intersection, and a pro-rated share of the costs for the planned signalization of the Mar West/Tiburon Boulevard intersection consistent with traffic mitigation fees to be determined by the Town of Tiburon and supported by

the Marin Countywide Plan.  The conditions of approval also require the applicant to pay the project's fair share for provision of overlapping phasing for the southbound left turn from Rock Hill Drive to Tiburon Boulevard.

"**Adopted Mitigation Measures**:

"5.1-2(a) identifies planned lane improvements at the Redwood Highway Frontage Road/Tiburon Boulevard intersection and the Trestle Glen/Tiburon Boulevard intersection that the applicant would contribute to. Also requires the applicant to pay a pro-rated share of the costs for the planned signalization of the Mar West/Tiburon Boulevard intersection consistent with traffic mitigation fees to be determined by the Town of Tiburon and supported by the Marin Countywide Plan.

"5.1-2(b) requires the applicant to pay the Project's fair share of provision of overlapping phasing for the southbound left turn from Rock Hill Drive to Tiburon Boulevard.

"The Board hereby adopts and makes a condition of approval Mitigation Measures 5.1-2(a) and 5.1-2(b)."

It is important to note that the private plaintiffs are not claiming that the mitigation measures will be inadequate.  Instead, they attack one aspect of the methodology used by the EIR to calculate the impact of traffic generated by the project or attributable to it.  The traffic analyst used what is called "level of service" (LOS) methodology.  It is an established standard (see *Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 623), and its use appears to be mandatory in Marin County.  As will be noted by Judge Chou, the LOS methodology was used by both the County and the Town, in their respective general plans

The point of plaintiffs' claim is quite precise—the EIR's analysis is fatally defective because, in analyzing peak traffic hours, while correctly

61

measuring the AM traffic to include both commute and school drop-offs, in calculating the PM traffic, the EIR used only the return commute hour, which did not take account of the school pick-up traffic, which occurs in the afternoon, not the early evening.

Judge Chou exhaustively analyzed the issue. We cannot improve upon his reasoning which, with minor editorial modifications, we adopt as our own:

"[Private plaintiffs] request[] that the FEIR and project approval be set aside and a new traffic analysis be prepared to include mid-afternoon, school-hour traffic impacts along Tiburon Blvd. In studying the project's potential cumulative impacts, the analyst collected traffic volume data at 15 main intersections, mostly along Tiburon Blvd., taken during the typical A.M./P.M. 'business rush' peak commute hours, in compliance with the criteria contained in The Highway Capacity Manual, the industry standard for conducting Level of Service (LOS) analysis. The May 2009 study included the signalized and unsignalized intersections running along Tiburon Blvd., Paradise Dr., and the Hill Haven neighborhood.

"The traffic volume count included the intersections where Tiburon's three public schools are accessed from Tiburon Blvd.: Reed Elementary School @ Lyford Dr.; Del Mar Intermediate School @ Avenida Miraflores; and BelAire School @ Blackfield Dr. The existing volume counts at these intersections were taken during the typical weekday AM/PM peak commute hours of 7:00–9:00 a.m. and 4:00– 6:00 p.m. during the school year. As discussed in the FEIR, the analyst determined peak weekday AM hours occurred between 7:45–8:45 a.m. and the peak PM hour traffic volume occurred between 5:00–6:00 p.m. Using the thresholds of significance for Level of Service (LOS) as provided in the County's and Town's general plans (measured in average seconds/minutes of vehicle delay), all intersections

were found to operate at acceptable LOS, both without or with the project, except at the stop sign-controlled intersection at Reed Ranch Rd., where the left turn to Tiburon Blvd. going south operates unacceptably at both A.M. and P.M. peak hours at existing volumes. The analyst then estimated the additional project-generated trips based on existing traffic patterns from a sample of residential areas during the weekday AM/PM peak hours on Paradise Dr. and Tiburon Blvd.; i.e., 26 inbound and 24 outbound trips would be expected during the AM peak hour, and 19 inbound and 30 outbound trips would be expected during the PM peak hour.

"The DEIR used this data to calculate the 'Existing-Plus-Project Conditions' (Impact 5.1-1); and Cumulative Buildout-Plus-Project-Impacts (Impact 5.1-2).For Impact 5.1-1, it was determined that although '[p]roject traffic would increase traffic volumes at study intersections along Tiburon Blvd. and Paradise Dr.' '[t]his would be a less-than-significant impact' and no mitigation was required. This acceptable LOS includes the three public school intersections; Lyford Dr., Avenida Miraflores, and Blackfield Dr.

"Next, estimating the cumulative future buildout contained in the Tiburon General Plan and the Tiburon Planning Area (Impact 5.1-2), the DEIR found that 'with planned improvements, all study intersections would operate with acceptable LOS with or without the project during the AM and PM peak hours, except for three: Avenida Miraflores (Del Mar Intermediate School) would operate unacceptably during the weekday AM peak hours; Rock Hill Dr. will have an unacceptable LOS during the weekday PM peak hours, and the Reed Ranch Rd. south-bound left turn onto Tiburon Blvd. would be unacceptable during both AM and PM peak hours.'

"The DEIR determined the effect of the project plus buildout would be cumulatively considerable for Avenida Miraflores and Rock Hill Dr.

intersections. But as for the southbound left-turn from Reed Ranch Rd. onto Tiburon Blvd., it was determined the potential project traffic would not add to the poor LOS from the left-turn onto Tiburon Blvd. since the project's traffic would be limited to the acceptable LOS flow of through-traffic along Tiburon Blvd. at that intersection.

"The mitigation measures identified in the DEIR for the cumulative impacts included Martha's payment of its share of development fees for planned signal and lane improvements as contained in the Tiburon General Plan. With these mitigation measures, the DEIR concluded the 'project impacts would <u>not be</u> cumulatively considerable significant impacts' at the Rock Hill Dr. and Avenida Miraflores intersections. In certifying the FEIR and approving the project, the Board of Supervisors adopted these mitigation measures.

"A few years later, in February 2013, the Town of Tiburon completed its own detailed traffic counts for the Tiburon Blvd. intersections affecting the schools. Following the circulation of the FEIR in June 2013, the County received comments requesting the County to analyze intersection impacts during peak school hours. Typical of the public comments challenging the FEIR's 2009 traffic study is this July 29, 2013 letter from [private plaintiff Tiburon Open Space Committee] criticizing the FEIR:

" 'Another obvious flaw of the FEIR is its inadequate and inaccurate assessment of traffic impacts on Tiburon Blvd. The FEIR analyzed business rush-hour traffic along this road, not school rush hour traffic, which is when traffic levels are truly at their peak. After-school traffic is gridlock and lasts for over an hour at varying times of the day, depending on the day and the schools' schedules. The afterschool traffic rush often coincides with the afternoon time period when worker and construction vehicles exit Tiburon

64

along Tiburon Boulevard.  This is a safety impact, and also contributes to a significant existing traffic problem.  The failure to assess traffic at its peak is a deficiency in FEIR, rendering the conclusions pertaining to significant impacts unsupported.  A new traffic analysis must be performed, and the report recirculated, because the current one does not address true peak levels of traffic on Tiburon Blvd.'

"In addition to the public comments, the record contains a July 23, 2013 summary of criticisms from the Planning Commission of perceived deficiencies in the FEIR, including the traffic impact analysis on Tiburon Blvd.:

" 'Traffic.  The response to comments does not adequately address the analysis of traffic impacts from the proposed project.  Specifically, the traffic analysis was based solely on the peak hours for commuter traffic and does not include an analysis of the impacts during the <u>other important local peak traffic period—that caused by school-related traffic</u>.  This information is critical for both the general public and the decision makers to fully understand the traffic impacts of the proposed project.'

"In response, the Board of Supervisors asked its environmental consultant (Nichols/Berman) to clarify this issue raised by the public.  In a memorandum to the County dated February 13, 2014, EIR consultant Bob Berman responded to the public comments which he described as requesting an analysis of 'school rush' traffic impacts, especially in light of the noticeable increase in school-related vehicle trips since the May 2009 DEIR; and to consider the 2013 traffic analysis for mid-afternoon (after school) traffic flow on Tiburon Blvd. on seven intersections also analyzed in the May 2009 study, including the three public school intersections noted above.

"Berman explained that the reason why the 2009 traffic study did not

examine the midafternoon school period was that the standard 'design' for Tiburon and most communities is that the morning and evening peak commute rush hour evaluated by the County is the basis on which streets are designed to meet 'predictable peak periods.' Comparing the 2009 PM peak hours (5:00–6:00 PM) with the 2013 Tiburon study's mid-afternoon peak hours, shows that the total traffic volume for these seven intersections was higher in the 2009 study than the 2013 Tiburon study. Four of the intersections in the 2013 study showed less ambient (without project) traffic volume than the 2009 study, including the intersections at Blackfield Dr.—Bel Air School and Lyford Dr.—Reed Elementary School.

"The 2013 study showed an increase in ambient after-school volume at the three remaining intersections: Trestle Glen—44 cars; San Rafael Ave.—36 cars; and Avenida Miraflores—Del Mar School, which showed only an 11-car increase. Although not mentioned by the consultant, this small increase in numbers in Avenida Miraflores over the 2009 PM peak hours study could be due to the School District's report of a district-wide student enrollment increase of 575 students between 2005 and 2013. The consultant stated that these existing traffic increases are within the range of daily fluctuations and are not meaningful, and the 2009 PM peak hour vehicle count provided a 'worst case scenario.' The court does not read the FEIR as ignoring the impacts to school-related traffic and hereby rejects the contention that the FEIR fails as an informational document.

"Because this contention challenges 'the scope of an EIR's analysis of a topic [or] the methodology used for studying an impact [or] the reliability or accuracy of the data upon which the EIR relied' the court applies the substantial evidence test. (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 898.) A court will apply this deferential

66

standard of review in favor of the lead agency to resolve disputed questions of fact relating to sufficiency of the methodology used to analyze the potential traffic impact of the project. (See *Saltonstall*[, *supra*,] 234 Ca1.App.4th [549,] 581 [challenge to the factual sufficiency of the EIR's traffic analysis is reviewed under the deferential substantial evidence standard].) The EIR's traffic analyst's choice of methodology to determine the project's potential traffic impact along Tiburon was consistent with established industry standards and there is substantial evidence in the record to show it was suitable for this location.

"While the Town's subsequent 2013 'school-rush' traffic study showed a slight increase in car volume for Avenida Miraflores, it also showed that the 2009 volumes were higher at the other two school-related intersections. This slightly higher traffic count four years later at Avenida Miraflores does not prove there was not substantial evidence to support the 2009 study's methodology of analyzing AM/PM business commute hours to estimate the project's potential impacts on LOS along Tiburon Blvd.

"It is settled that the County is not required to conduct every requested test in order to satisfactorily analyze a potential impact, and 'our courts have repeatedly emphasized that an EIR must demonstrate a good faith effort at full disclosure; it does not require perfection, nor exhaustive analysis. [Citation.]' (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 342-343.) 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary.' (*Laurel Heights*, *supra*, 47 Cal.3d [376,] 415.) The County's traffic analyst 'was entitled to rely on the methodology and conclusions it articulated in its draft

EIR because it had the prerogative to resolve conflicting factual conclusions about the extent of traffic congestion that would result from the . . . project. [Citation.]' (*Saltonstall, supra,* 234 Cal.App.4th [549,] 582–583.)

"On this record, the court finds that [private plaintiffs have] not sustained [their] burden to show either: the DElR's impact analysis 'deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts' (*Neighbors for Smart Rail*[ *v. Exposition Metro Line Construction Authority,*] *supra,* 57 Cal.4th [439,] 463); or that the conclusions, determinations and methodology used to study this impact were not supported by substantial evidence in the record. (See *Save Panoche Valley* [*v. San Benito County* (2013)] 217 Cal.App.4th [503,] 514.) The County did not abuse its discretion by not requiring the traffic impacts to be measured during the mid-afternoon 'school rush' hour, and the petition is denied on this ground."

We add one point to Judge Chou's analysis only to make it more emphatic. By itself, Mr. Berman's response to the Supervisors' query constitutes all the substantial evidence needed to settle the issue. In their brief, the private plaintiffs merely re-argue the same evidence they did before Judge Chou, an approach that can have no hope of success in a reviewing court. (E.g., *Hjelm v. Prometheus Real Estate Group, Inc.* (2016) 3 Cal.App.5th 1155, 1166; *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.) [29]

---

[29] We note that the issue has been simplified for future cases. Effective July 1, 2020, the Guidelines now specify how transportation impacts are to be measured. That measure states explicitly that "vehicle miles traveled is the most appropriate measure of transportation impacts." (Guidelines, § 15064.3, subd. (a).) (See Practice under the California Environmental Quality Act, *supra,* § 13.70, p. 13-78.2 [Guideline does not

### C. Mitigation Of Pedestrian Safety

The Town asserts that "No evidence supports the County's finding that the impacts on pedestrian safety in Town neighborhoods will be mitigated." This is what the County decided:

"**IMPACT 5.1-7:  Project Impact on Pedestrian Circulation**.

"*Facts*:

"The EIR found that Paradise Drive fronting the project site is a roadway considered unsafe for pedestrian use.  The project would add traffic to this unsafe existing roadway condition.  While not significant alone, this additional increment of motor vehicle and pedestrian traffic would exacerbate already constrained conditions.  This would be a significant cumulative impact.  Additionally, the project site provides no pedestrian accommodation (no sidewalks or pathways outside the travel lane) on its proposed roadways, and there is no public access through the site other than an access easement to Old St. Hilary's Open Space along 20-foot-wide roadways. . . .

"*CEQA § 21081(a) Finding*:

---

"apply to steps in the CEQA process completed before the effective date or to CEQA documents that were circulated for public review before then"].)

The same Guideline just as plainly states that "a project's effect on automobile delay shall not constitute a significant environmental impact" (Guidelines, § 15064.3, subd. (a)), and it is clear from the brief that delay was and is in the forefront of the private plaintiffs' thinking.

The Guideline also reiterates the point noted by Judge Chou:  "A lead agency has discretion to choose the most appropriate methodology to evaluate a project's vehicle miles travelled. . . ."  (Guidelines, § 15064.3, subd. (b)(4); see *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 228 ["A lead agency enjoys substantial discretion in its choice of methodology"].)  This would be true when the agency is following established local practice, and even more so if it is following positive statutory command.  As already noted, it is not clear what is the precise basis for using the LOS methodology in Marin County.

"Finding # 1:  This impact is mitigated to a less-than-significant level.

"*Evidence Supporting the Finding*:

"Based upon the EIR and the entire record, the conditions of project approval implements mitigation measure 5.1-7(a) by requiring roadway improvements to maximize widening and refuge areas for pedestrians at Forest Glen Court/Paradise Drive (consistent with Mitigation Measure 5.1-3)[30], Design the intersection of the driveway serving Modified Master Plan Lots #40–#43 with Paradise Drive to provide maximum amount of widening and paved refuge area for pedestrians.  Requires shoulder widening as required with Mitigation Measure 5.1-6 (a thru c).

"The Modified Master Plan implements mitigation measure 5.1-7(c). The redesigned residential roadways serving the project site comply with Marin County's residential roadways standards and include a pedestrian walk on one side of the roadway.  A public access easement is provided along Ridge Road-Tam View Court connecting existing residential development in Tiburon with Old St. Hilary's open space.  The access is an all-weather surface consistent with the Marin Countywide Trail Plan.

"**Adopted Mitigation Measures**:

"5.1-7(a) requires certain off-site roadway improvements, consistent with Marin County Code section 24.04.510.

"5.1-7(b) requires implementation of certain measures along Hill Haven neighborhood streets to improve safety, including posting of signs and

---

[30]  "5.1-3 requires preparation of a right-of-way improvement plan that shows adequate sight distance would be provided and shall include improvements to the Forest Glen Court/Paradise Drive intersection to provide a minimum 158 feet of sight distance and widening of Paradise Drive to include four-foot shoulders with minimum 60-foot taper at the proposed Forest Glen Court intersection."

restrictions on placement of dumpsters.

"5.1-7(c) requires certain on-site road improvements, consistent with Marin County Code section 24.04.440(b) and (c) regarding sidewalks and section 24.04.490 regarding sidewalk grades.

"The Board hereby adopts and makes a condition of approval Mitigation Measures 5.1-7(a), 5.1-7(b), and 5.1-7(c)."

Initially, the Town states that "Although the three mitigation measures identified in Mitigation Measure 5.1-7(b) are exclusively within the Town's jurisdiction, the County failed to find that they 'can and should be' adopted by the Town." Martha (and by joinder the County) responds that the point is waived because it was not raised during the extensive administrative process. The Town does not challenge this conclusion in its reply brief. This we take as an implicit concession that Martha's waiver argument is sound, (*Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90), meaning the merits were not preserved for review.[31] (§ 21177, subd. (a); *Stop Syar Expansion v.*

---

[31] This may also be deduced from Judge Chou's statement of decision. In analyzing the mitigation measures in 5.1-7, he simply stated, "These measures will require the approval of the Town." That he went no further suggests that there was no pending dispute before him of the kind the Town now advances.

The Town did state in its opening brief that it "and others addressed the flaws in the County's analysis of traffic and pedestrian impacts and mitigation measures." This is an expansive interpretation of the materials cited to support the statement.

Of the four communications actually from the Town, the first stated that because "the Draft EIR recommends several mitigation measures that call for actions by the Town of Tiburon to mitigate traffic, safety, or other project impacts . . . we believe that . . . the Final EIR should list the Town as a Responsible Agency." The second claimed that mitigation measure 5.1-7 would "exacerbate" existing conditions, not improve them, and ends with the enigmatic question "Would this impact remain a significant and unavoidable safety impact, in the opinion of the EIR preparers, if this mitigation measure

71

*County of Napa* (2021) 63 Cal.App.5th 444, 453.)

In any event, even if the point had been preserved for appeal, it would not prevail.

Impact 5.1-7 does not have the language found in Impact 5.1-10 that "Another public agency can and should mitigate the impact." Martha, joined by the County, calls this omission "at most, a scrivener's error," and we are inclined to agree. It is clear from the text that the specified actions could only be accomplished by the Town. The Town's participation in this appeal makes it constructively aware of what is expected of it. In these circumstances, the omitted language qualifies as "insubstantial or de minimis," and thus "not prejudicial." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th 459, 486.)

In light of what was said with respect to the mitigation of traffic safety earlier in this opinion, there can be no doubt that pedestrian safety along narrow and winding roads is not a problem that was flying under the radar. If space was tight for vehicles, the hazard for pedestrians is apparent. The County candidly admitted that pedestrians were already at risk and would

---

is not implemented?" The last, the most detailed, was in effect a laundry list of complaints of "inadequate analysis," with the proposed mitigation measures called "unacceptable," "window dressing," or "plausible in theory, but its successful real world implementation is highly questionable." The fourth reiterated that "the Town of Tiburon continues to find mitigation of certain impacts identified in the EIR as inadequate, . . . likely to be ineffective and/or unlikely to be implemented."

The rest of the record citations are to letters from residents, one couple in particular. They are long on opposition and short on specific proposals.

only become more so.[32]

Nevertheless, the mitigation measures imposed are more than reasonable. The tight regulation of traffic already discussed would obviously correlate to pedestrian safety, a point recognized in the EIR. However, for pedestrian traffic topography was not the constricting factor it was for vehicular traffic. Again, we note that the Town does not point to any alternative measure mentioned during the extensive administrative proceedings that would have improved matters but was rejected by the County. The County imposed mitigation measures specifically directed at improving pedestrian safety. Under the peculiar physical circumstances presented here, the record contains ample substantial evidence showing a good faith attempt to produce " 'a reasonable plan for mitigation.' " (*City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th 341, 365.) That is sufficient to defeat the Town's contention. (See Practice under the California Environmental Quality Act, *supra*, § 14.9, p. 14-12.)

### E. Mitigation Of The California Red-Legged Frog

The Town frames its final argument as follows:

"A breeding population of threatened California Red Legged Frogs [CRLF] lives just to the east of the Project site in a five-acre, freshwater

---

[32]   Judge Chou admirably characterized the situation: "The record establishes that under existing traffic volume these residential streets already are recognized as dangerously unsafe for pedestrians and vehicles, and are even more so when parking is allowed on one or both sides of these narrow streets."

Martha uses more biting language: "the purpose of this measure is not to make the roads safe—Tiburon has for long permitted them to be unsafe—but to mitigate the Project's minimal contribution to such existing conditions." By "minimal," Martha refers to the traffic study's conclusion that the project would generate 26 inbound and 24 outbound trips in the "AM Peak Hour," and 19 inbound and 30 outbound in the "PM Peak Hour."

pond, Keil Pond, on a property called Keil Cove.  Keil Spring—a naturally occurring spring upland of Keil Cove, on a small parcel completely bounded by Martha Company's property—is the sole source of water for Keil Pond and the surrounding 34 acres of historic botanical gardens of Keil Cove."

"The EIR hydrologist determined that the Project could result in hydrologic impacts that may affect both water quality and water flow patterns in the drainage ways that flow downstream to Keil Pond.  For example, the Project will impact water quality in Keil Pond by increasing erosion, sedimentation, and pollutants (chemicals from landscaping, and oil and grease from vehicles).  The County determined that the Project 'could result in degradation to downstream waters during Project construction and operation and this could potentially result in impacts to CRLF breeding habitat in Keil Pond.' "

"The EIR found that the Project would have a significant impact on CRLF, but that this could be mitigated to a less-than-significant level by various mitigation measures.  However, the County violated CEQA by (1) improperly deferring mitigation; and (2) failing to reconcile its finding that one of the Project's significant unavoidable impacts—the destruction [of] Keil Spring (the sole water source of Keil Pond)—with its finding that the impact on CRLF will be mitigated to a less-than-significant level."

The second part of the Town's contention is stated as follows:  "The County violated CEQA by failing to analyze whether the significant and unavoidable impact on the water supply for Keil Pond will adversely impact [the] CRLF."

The Board's finding that "Impacts to the California Red Legged Frog" "is mitigated to a less-than-significant level" set out the "Evidence Supporting the Finding":  "[a]doption of these mitigation measures would

74

result in the in perpetuity preservation and management of a minimum of 35.6 acres of foraging and dispersal habitat for CRLF to compensate for between 7.4 and 12.8 acres of such habitat that would be lost as a result of the Project . . . . In addition, adoption would eliminate or reduce the likelihood of individual CRLF being harmed or killed during Project construction."

Five mitigation measures were imposed:

"5.6-2(a) requires avoidance of CRLF dispersal movements by redesign of the site plan in the Forest Glen area to provide connectivity via a minimum 100-foot wide woodland corridor between preserved woodland habitat in the southern and northern portions of the site. If the 100-foot-wide corridor is not feasible, the applicant must create wetland habitat on site or enhance existing wetlands on the Project site so these wetlands function as a breeding habitat. The Project, as modified by the Martha Company's June 6, 2017 revised site plan, incorporates the provisions of Mitigation Measure 5.6-2(a) and will create and/or enhance existing wetlands.

"5.6-2(b) establishes the preservation requirements for CRLF foraging and dispersal habitat at a minimum 3:1 preservation to loss ratio. Also includes provisions that, in the event a 3:1 ratio of on-site preservation is not feasible, the applicant must make up any difference by purchasing and preserving CRLF habitat off-site in the Project region. This option requires a conservation easement and a CRLF Mitigation Plan. The Project, as modified by the Martha Company's June 6, 2017 revised site plan, incorporates the provisions of Mitigation Measure 5.6-2(b) and will provide a 3.66:1 preservation to loss ratio.

"5.6-2(c) ensures the in-perpetuity preservation of CRLF habitat remaining after Project development through dedication of Parcel A to the

75

MCOSD [Marin County Open Space District] or another public agency or non-profit approved by the County. Also requires BMPs [Best Management Practices] that are consistent with Mitigation Measures 5.5-1 and 5.5-3[33] to

[33] "5.5-1(a) requires implementation of construct BMPs shown on the applicant's Stormwater Control Plan as well as preparation of a Stormwater Pollution Prevention Plan to be implemented during construction that pays particular attention to: (1) the construction access road and associated vehicular pollutants; (2) vehicle wash areas to ensure that sediment is not tracked onto Paradise Drive; (3) fuel and other toxic compound storage; (4) BMPs to control sediment and erosion; (5) revegetation; and (6) trash control.

"5.5-1(b) requires implementation [of] the post-construction BMPs shown on the applicant's Stormwater Control Plan that detains the post-development increase in peak flow rates, directs roof runoff and runoff from other future residential impervious surfaces to bioretention areas, and installing a Filterra Bioretention Systems in roadway catch basins. Also requires preparation of a Stormwater Control Plan as a stand-alone document that details post-project stormwater control measures and utilizes information from the County Code and the County's *Guidance for Applicant's, Stormwater Quality Manual for Development Projects in Marin County*.

"5.5-1(b) also requires incorporation of site-appropriate BMPs in the project Stormwater Control Plan for short- and long-term implementation in order to comply with the requirements of the Phase II NPDES [National Pollutant Discharge Elimination System] permit that includes: (1) monthly street sweeping; (2) informative documentation regarding the use of less toxic pest management procedures, including integrated pest management; and (3) bioswales, or other geotechnically appropriate methods for treatment of runoff from the lots' impervious surfaces."

"5.5-3(a) requires the applicant to implement those measures in Mitigation Measure 5.5-1(a) that require compliance with NPDES Construction General Permit requirements for construction activities that disturb more than one acre. It also requires the applicant to add a provision to the Project CC&Rs stating that the Property Owners Association would be responsible for ensuring that the developer of each lot be required to meet all conditions specified in the NPDES Construction General Permit.

"5.5-3(b) requires the applicant to implement Mitigation Measure 5.5-1(a), which requires the applicant to prepare a Stormwater Pollution

maintain water quality in downstream drainage channels and off-site ponds.

"5.6-2(d) ensures the in-perpetuity preservation and management of CRLF habitat remaining after Project development by developing, implementing, and funding an RMP as set forth in Mitigation Measure 5.6-1.[34]

Prevent[ion] Plan (SWPPP) and Mitigation Measures 5.5-1(b), which requires the applicant to prepare a standalone Stormwater Control Plan.

"5.5-3(c) requires geomorphic evaluations and installation of rip rap receiving pads and/or velocity reducers at each point discharge location. Also provides specific instruction of erosion and sedimentation control equipment with respect to the project site's steep topography. Requires maintenance procedures for devices established and transferred to the Property Owners Association.

"5.5-3(d) requires implementation of Mitigation Measure 5.5-2 [also dealing with stormwater drainage].

"5.5-3(e) provides standards for final design of site stormwater runoff detention facilities to ensure runoff storage volume sufficient to mitigate for the volume differential between the pre- and post-development, for 100-year rainstorm. In addition, runoff detention facilities serving on-site roadways should be sized to accommodate the increased stormwater runoff volumes generated by the expanded 28-feet roadway width stipulated by Mitigation Measure 5.1-11 and the additional parking spaces stipulated by Mitigation Measure 5.1-12, rather than the Project's proposed 20-feet roadway width and parking configuration. To the extent feasible, required off-lot parking spaces should be founded on permeable pavers/pavement, gravel, or other permeable materials, in order to minimize required increases in the size of stormwater detention facilities, and to reduce the potential secondary grading and stabilization structure construction impacts that could accrue from expansion of these facilities. Permeable parking spaces should be restricted to areas outside of the recharge area identified for Keil Spring."

34 "5.6-1(c) Ensure the in perpetuity preservation and management of special status plant habitat remaining after project development:

"Develop and implement a Resource Management Plan (RMP) for all sensitive habitats (special status plant habitat, CRLF habitat, native bunchgrass habitat, woodland habitat, and wetlands) preserved within Parcels A and B (or any other parcels created for the purpose of habitat

preservation as stated in Mitigation Measure 5.6-1(b).  Marin County CDA—Planning Division shall review and approve the RMP in consultation with the MCOSC and all applicable agencies . . . . )  The RMP shall be written by a qualified biologist with expertise in the various sensitive resources to be covered by the RMP.  At a minimum, the RMP shall include the following:

"Allowed and prohibited activities on preserved lands.

"The location and type of any fencing, signs, and/or displays to be constructed on preserved lands.

"A monitoring and management plan for non-native and/or invasive species, or pathogens, considered detrimental to protected resources (weed abatement, invasive species removal, SODS management, CRLF predator control, etc.).

"The types and frequency of any maintenance activities to be conducted on preserved lands (litter removal, fence or sign repairs, etc.).

"A Fuel Management Plan element to ensure that vegetation on the persevered areas and adjacent private lots within the project site would be maintained consistent with all current and future fire safety guidelines.  The plan shall include provisions for mitigating woodland impacts as a result of fuel management activities through woodland enhancement in unaffected areas of the site.

"A mitigation, monitoring and management plan for any sensitive habitats to be restored, enhanced or created on preserved lands (wetlands, CRLF habitat, etc.) as required by the EIR mitigation measures or that may be required as a result of permit conditions of regulating agencies.  The plan shall include the extent of the monitoring period, quantifiable performance measures and success criteria; an adoptive management component with remedial measures should performance measures fall short of success criteria; quantifiable final success criteria; and once-annual report of findings to be provided to the County and any applicable resource agencies.

"A monitoring plan to monitor the condition of resources occurring on preserved lands and adjacent private lots within the project site.  This monitoring plan would help the responsible public agency or non-profit determine if private landowners are engaging in activities which are prohibited under the CC&Rs and which are having adverse effects on adjacent preserved resources.  A component of the monitoring plan would be to ensure that adjacent private lot owners with the project site are managing vegetation on their lots consistent with [] current and future fire safety

78

"5.6-2(e) requires pre-construction surveys and daily construction monitoring during development within the woodland habitat and occurring within 300 feet of any drainageway to minimize harm or mortality to CRLFs."[35]

Deferring environmental analysis is disfavored. (E.g., Guidelines § 15126.4, subd. (a)(1)(b); *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307.) However, unlike the Town, we do not equate the best management practices as "deferring mitigation." BMPs appear to qualify as "revisions in the project plans . . . agreed to by[] the applicant" (§ 21080, subd. (c)(2)), and, because the mitigation measures, including the BMPs, were accepted by Martha as "condition[s] of approval," they would appear to satisfy this statutory standard. (See *Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency*, *supra*, 6

requirements. The plan would include a provision for a once-annual meeting between the POA and the responsible public agency or non-profit staff to discuss results of these monitoring activities and necessary remedial measures.

"Clearly stated short-term and long-term responsibilities of the applicant, the POA, and the MCOSD or other approved public agency or non-profit for the implementation and funding of the RMP.

"Determine a mechanism by which the Resource Management Plan shall be funded in perpetuity in consultation with Marin County, the MCOSD or other approved public agency or non-profit, and all applicable agencies . . . . Such a mechanism would be the establishment by the applicant of a non-wasting endowment, funded by the applicant and/or through POA fees."

[35] In the administrative record is a 2011 letter from the Town's Community Development Department headed "Comments on Draft EIR." In this letter, the County was advised that "the 32-unit alternative" would have a "greater" adverse impact on the CRLFs than "the 43-unit project." Moreover, with respect to the mitigation measures identified in the Draft EIR, "we urge that the County adopt those measures."

Cal.App.5th 1237, 1254.) Moreover, the BMPs were already in existence, as they are "shown on the applicant's Stormwater Control Plan." Thus, there is no deferral. (See *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 722; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 795–796.)

It is true that certain measures were not yet in existence. The mitigation measures ordered by the County refer to Martha being required to prepare and implement a Stormwater Pollution Prevention Plan and a "Resource Management Plan . . . for all sensitive habitats." However, the contents of both were specified, and the latter was to be reviewed and approved by the County Planning Department "in consultation with . . . all applicable agencies." Martha was in effect being told to comply with existing regulations. Such a directive "is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Oakland Heritage Alliance v. City of Oakland, supra*, 195 Cal.App.4th 884, 906.)

In addition to the BMPs already formulated, the measures also refer to Martha's Stormwater Control Plan, already in existence, and a National Pollutant Discharge Elimination System, which already appears to have been issued.

It is thus apparent that the mitigation measures do not stand alone, but effectively incorporate by reference many other documents and measures. Martha is not a free agent, but is subject to oversight by numerous governmental agencies. To analyze the impact and effectiveness of the mitigation measures would require an integrated examination of all of these sources. Remember that the Town is concerned with "water quality and water flow patterns in the drainage ways that flow downstream to Keil Pond." It is too obvious to require explanation that a Stormwater Control

Plan would be pertinent to "water flow patterns" and "drainage." The same is true for the relevance of a Pollutant Discharge Elimination System to the issue of "water quality." The contents of the Stormwater Pollution Prevention Plan that Martha is to prepare and implement must address pollutants and erosion, which would seem pertinent to "water quality," "water flow patterns," and "drainage." Finally, reference is made in the mitigation measures to "the County's *Guidance for Applicants, Stormwater Quality Manual for Development Projects in Marin County*."

An appellant is required to "support each point [in the opening brief] by argument and, if possible, by citation of authority." (Cal. Rules, of Court, rule 8.204(a)(1)(B).) The Town's "argument" does not meet this standard.

There is an additional point addressed only in passing by the Town, namely the fate of the Keil Spring and Keil Pond. The Town states that the County is willing to stand by and permit the "destruction [of] Keil Spring." This is what the County decided:

> "**Impact 5.5-6: Depleted Groundwater Supplies, Keil Spring and the Keil Property Spring-Based Water Supply**
>
> "*Facts*:
>
> "The EIR found that landslide repair or improvements required to stabilize existing landslide deposits would convert on-site groundwater to surface water. The addition of impervious surfaces in the form of pavement and roof coverage would eliminate areas of existing groundwater recharge. These impacts would reduce the available water supply to Keil Spring and the underground cisterns located on the Keil property. A reduction in the available water supply to Keil Spring and/or the cisterns could result in a reduction in the availability of this historic water supply to the Keil property. A reduction in the amount of groundwater discharge from Keil Spring and/or the Keil property cisterns would result in a reduction to this historically

relied upon groundwater supply for irrigation of historically significant gardens and would result in a significant impact. . . .

"*CEQA § 21081(a) Finding*:

"Finding 3:  The impact would be mitigated, but not to a less than significant level.  Special considerations make further mitigation measures or alternatives infeasible.

"*Evidence Supporting the Finding*:

"No feasible mitigation is available due to lack of cooperation by the downstream property owner (Keil) and the resulting lack of access to the Keil property water supply system for:  (1) installation of a piping system to deliver intercepted upslope groundwater to the Keil storage facilities; or (2) monitoring of Keil Spring and cistern flows vs. irrigation use.[36]  Since no feasible mitigation is available, this impact would be a significant and unavoidable impact."

So, the project will result in less runoff from the Martha property to the Keil property, where the frogs live and breed.  However, the owner of the Keil

---

[36]  Actually, the Draft EIR made it clear just how obdurate the Keil family was being:  "[T]he Keil Family has formally reiterated two positions it holds relative to the Easton Point project and the mitigation measures proposed . . . .  First, the family *will not allow any constructed drainage improvements* designed to direct upslope groundwater intercepted by subdrains associated with proposed landslide repairs back to its groundwater-based water supply system, as proposed . . . .  Second, the Keil Family *will not cooperate in any way* with the project applicants to provide baseline water supply or water use data for its facilities, including its in-holding spring, its groundwater cisterns, Keil Pond, or its network of above-ground storage tanks, pumps, and conveyance lines."  (Italics added.)  The consequence of this non-cooperation converted what was mitigatable into "a significant unavoidable impact."

This is a useful reminder that not all the relevant actors in a CEQA question are formal parties.

property is not willing to co-operate in mitigation. Still, look at the language of Mitigation Measure 5.5-1(b), specifically "the applicant's Stormwater Control Plan that . . . directs roof runoff and runoff from other future residential impervious surfaces to bioretention areas, and installing [a] Filterra Bioretention Systems in roadway catch basins." Mitigation Measure 5.5-2 requires measures to re-direct runoff water in the same direction prior to "pre-disturbance conditions." Mitigation Measure 5.5-3(e) provides for "stormwater runoff detention facilities to ensure runoff shortage volume sufficient to mitigate for the volume differential between the pre-and post-development." Mitigation Measure 5.5-1(b) provides for the runoff to be treated.

The mitigation measures adopted appear to constitute a comprehensive attempt to deal with the problem, given the limitations under which Martha and the County were forced to operate. (See fn. 36, *ante*.) Yet again, the Town points to no specific alternative or addition that was rejected. A certified EIR is only required to have " 'a reasonable plan for mitigation.' " (*City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th 341, 365; see *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.*, *supra*, 24 Cal.App.4th 826, 843 ["an EIR must only consider 'a reasonable range of . . . mitigation measures' "]), and it is entitled to judicial deference. (Practice under the California Environmental Quality Act, *supra*, § 14.9, p. 14-12.) The Town has failed to prevent a coherent and developed argument as to why the EIR certified by the County is unreasonably inadequate.

### F. The Water Tank and Fire Flow Mitigation

This is what the County decided:

"**Impact 5.7-7     Water Service Impacts**

83

"The proposed project includes construction of a new 180,000-gallon water supply tank and distribution lines within the project site. Due to constraints with the proposed water supply and distribution system and additional constraints with the existing water lines located under Paradise Drive, some homes would not have the standard water pressures required for domestic water service. This would be a significant impact.

"The existing Hill Haven and Paradise water tanks are not capable of providing adequate water supply to the project site. The proposed project includes construction of a new 180,000-gallon water supply tank on Parcel C within the project site, which along with the proposed distribution would meet the water service needs of the proposed development.

"**DOMESTIC WATER SUPPLY**

"As described above, in order to provide standard water pressure the MMWD [Marin Municipal Water District] requires that the highest water-using fixture in a structure be located no higher than 94 feet below the mid-point of the water serving tank. This provides the standard pressure of 40 psi for domestic water use. Water pressures on the project site may be less than the standard pressure.

"At the request of the project applicant, in July 2009, the MMWD completed a preliminary water feasibility analysis for the proposed project. The results of the preliminary water feasibility analysis are shown in **Exhibit 5.7-1**. This analysis assumed a bottom water tank elevation of 575 feet. Based on the MMWD analysis 26 homes would have a standard water pressure (40 psi and above). As many as 17 of the proposed homes, Lots 4 through 9, Lots 20 and 24, and Lots 35 through 43 would have low pressure (30 to 39 psi) or less. As a condition of receiving water service, homes with water pressures below 40 psi would be required to sign a low-pressure

84

agreement with MMWD.  In addition, homes with water pressure of 29 psi or less would be required to install a low-pressure pump.  [¶] . . . [¶]

"In order to resolve water pressure and water flow issues, the project applicant has investigated several modifications to the proposed water system.  These include:

"In order to increase water pressure and flow to the upper elevation lots (generally Lots 1 through 3, 4 through 9, 20, 24, and 35 through 39) increase the elevation of the bottom of the proposed water tank from 580 feet to 590 feet.

"In order to increase water pressure and flow to proposed Lots 21 through 23, the applicant would upsize the existing six-inch water line located within the portion of Paradise Drive right of way that runs adjacent to the project site to an eight-inch line.  The portion of the water line that would be upgraded extends from the location of the MMWD's access road for the Paradise Water Tank to the location of the proposed driveway for Lots 21 through 23.  The proposed Swahn residential project, located on Bluff Point, across Paradise Drive from the *2008 Easton Point Residential Project*, proposes some improvements along it Paradise Drive frontage.  It is proposed to replace approximately 745 feet of the existing six-inch water main located under Paradise Drive with an eight-inch water main to improve water pressure and fire flow at the project site.  Completion of this work would reduce the amount of pipeline that the Easton Point applicant would need to upsize in order to improve water pressure and fire flow for Lots 21 through 23.

"**Mitigation Measure 5.7-7**  In order to reduce water service impacts the applicant shall work with the MMWD to develop a water supply plan.  The water supply plan shall clearly show that adequate water pressures

85

would be provided to the new houses on the project site.  The plan shall include the following:

"Increase the base elevation of the proposed water tank to 590 feet.

"Replace the existing six-inch water main in Paradise Drive with an eight-inch water main from the proposed driveway for Lots 21 through 23 to Forest Glen Court.  The length of the pipe replacement would be approximately 3,750 feet.

"The applicant and/or property owners shall enter into a low-pressure agreement with the MMWD that serves as a written release from liability for any damage or inconvenience associated with the low-pressure domestic water service.  If necessary, the applicant or property owner must install a low-pressure pump to provide adequate water pressure for the residence.

"**Significance after Mitigation**  Increasing the elevation of the proposed water tank and replacing the water main in Paradise Drive would reduce the number of homes on the project site that would have less than standard water pressure.  By entering into an agreement with the MMWD to allow low pressure domestic water service individual property owners  would be obligated to install any equipment necessary to provide enough water pressure for domestic use.  Taken together, the individual components of Mitigation Measure 5.7-7 would reduce water service impacts to a less-than-significant level.

"Implementation of Mitigation Measure 5.7-7 may result in secondary visual impacts.  Increasing the elevation of the proposed water tank may result in the tank being slightly more visible than as discussed in **Section 5.8 Visual Quality** discussion of *Impact 5.8-4 View from Ayala Cove on Angel Island (Viewpoint No. 4).*

"**Responsibility and Monitoring**  MMWD would be responsible for

designing the water delivery system including the new 180,000-gallon water storage tank. The applicant shall pay MMWD for designing the water delivery system. The applicant's contractor shall install the new water lines and water storage tank. MMWD would be responsible for monitoring and verifying construction of the water delivery system." (Fns. & original emphasis omitted.)

"**Impact 5.7-8    Inadequate Fire Flow**

"As designed the proposed project would have houses located at elevations where, in relation to the elevation of the proposed water tank, the water pressure would not be adequate to provide minimum fire flow requirements. This would be a significant impact.

"As discussed above, the TFPD [Tiburon Fire Protection District] minimum fire flow requirement for fire hydrants that would serve homes greater than 3,600 square feet is 1,500 gallons per minute for a period of two hours with water pressure at 20 psi. Fire flow requirements can be reduced based on the inclusion of certain additional protective measures in the house design.

"Based on the preliminary feasibility analysis prepared by MMWD (see **Exhibit 5.7-1**) the minimum fire flow requirements would not be achieved for several lots. These include Lots 7 through 11, 19 through 24, and 35 through 43.

"A lack of vertical separation from the elevation of the proposed water supply tank and fire hydrants combined with the static loss of water pressure would inhibit the available fire flow for the residential lots proposed at higher elevations. These include Lots 7 through 11, 19, 20, 24, and 35 through 43. The calculated fire flow for Lots 7 through 11, 19, and 20 through 23 are close to meeting the minimum requirements, and it is likely the TFPD would

accept a reduced fire flow with mitigation to require upgraded building sprinkler systems and non-combustible construction materials for these lots. Achieving acceptable fire flow for Lots 35 through 43 is more problematic, and may require limiting the size of the homes on these lots as well as structural upgrades for fire safety.

"Acceptable fire flow requirements for Lots 21 through 23 can be achieved by upgrading the existing water line located at Paradise Drive to eight inches from the proposed driveway for Lots 21 through 23 to Forest Glen Court.

"Ultimately, house sizes on the project site would depend on a number of factors besides fire flow, including the type of building construction, the fire resistance rating of materials used in construction, provision of automatic sprinklers, access to the structure, location of hydrants, vegetation management, and types of fire equipment available to suppress a fire. The final fire flow requirement for each future house on the site cannot be determined until the final building and landscaping plans are presented to and evaluated by the TFPD.

"**Mitigation Measure 5.7-8** In order to mitigate the project's impacts resulting from inadequate fire flow the applicant shall execute the following through coordination with the TFPD and the MMWD.

"**Mitigation Measure 5.7-8(a)** Acquire approval of reduced fire flow requirements from the TFPD (as permitted in 2007 California Fire Code) by implementing structural enhancements to proposed residences including but not limited to:

"Upgrades to building sprinkler systems.

"Utilizing non-combustible exterior building materials.

"**Mitigation Measure 5.7-8(b)** Limit the size of proposed houses

(total allowable square footage) as needed to meet fire flow requirements.

"**Mitigation Measure 5.7-8(c)** Upgrade existing water line located in Paradise Drive to an eight-inch line in order to provide adequate water flow and pressure for fire flow requirements.

"**Significance after Mitigation** Implementation of these mitigation measures would reduce the project's fire flow impacts to a less-than-significant level through compliance with fire flow requirements by qualifying for reduced fire flow requirements, upgrading existing infrastructure to increase available fire flow, or reducing the proposed building square footage on certain lots to sizes that comply with fire flow calculations.

"**Responsibility and Monitoring** The applicant would be responsible to implement Mitigation Measure 5.7-8 and should coordinate with the TFPD and the MMWD to ensure all requirements are met. Monitoring of this mitigation measure can be verified by Marin County by requiring written approval from the TFPD prior to issuance of building permits." (Fns. & original emphasis omitted.)

The private plaintiffs argue that "nothing in MM5.7-7 requires the future formulation of mitigation recommendations, and there is no requirement that [Martha] actually implement any mitigation that might result from the water supply plan. For example, if it is determined that 'adequate water pressures' cannot be obtained for certain lots, nothing in MM 5.7-7 would prevent development of those lots. That is not acceptable."

There follows discussion of the proposed water tank's height. "[A]lthough MM 5.7-7 required that the base elevation of the proposed water tank be *raised* to 590 feet, the modified plan *lowered* the tank to 570 feet. MMWD approved [Martha's] water supply plan. However, while the EIR's

analysis establishes that lowering the tank results in lowered water pressures, the County simply lowered it standards in response without further analysis or study and approved the modified plan.  While the EIR's analysis required a water supply capable of providing a minimum of 1,500 g.p.m. to fire hydrants for two hours, the County ultimately approved the modified design in providing 750 g.p.m. for one hour.  [¶]  The record fails to justify the reduced standards."

In addition to attacking the mitigation measures as inadequate, plaintiffs says the same of the monitoring program.

Martha objects that both of the issues were not raised prior to the Board's final action, and, thus, there was a failure to exhaust administrative remedies, with the consequence that the issue was not preserved for review.[37] The plaintiffs respond that, given the timing, objection was not possible and is therefore excused.  (§ 21177, subd. (e).)  Additionally, they indicate that their true target is simply the Mitigation Monitoring and Reporting Program. Although there is some initial plausibility to the plaintiffs' position, it is

---

[37]   In a footnote of its brief, Martha states:  "While the EIR evaluated home water pressure and fire flows, neither raises environmental concerns that must be studied under CEQA.  They are only impacts of the Project on *itself*, not impacts on the *environment*.  Thus, they did not need to be analyzed in the EIR."  Our response is threefold.

First, a footnote is not the appropriate way to introduce an important issue like this.  (*Evans v. Cornerstone Development Co.* (2005) 134 Cal.App.4th 151, 160.)  Second, the issue was not raised in the trial court.  The omission is conspicuous because it is obvious that Martha made the exact same argument with respect to the issue next discussed in this opinion.  Third if Martha is saying that the completed project will have no environmental impact if there is a fire, we would emphatically disagree.  If the project is completed, and if there was a fire, and if the inadequacies of water pressure contributed to houses on the site being consumed by fire, or contributing to the spread of that fire, we would be interested to know how such a result could not be considered an environmental impact of the project?

largely the product of the unusual chronology of proceedings before the Board, and, ultimately, does not withstand scrutiny.

That position is that the Board essentially pulled an unexpected rabbit out of a hat, catching the plaintiffs completely by surprise. As shown by Judge Chou's statement of decision, quoted earlier, the issue of fire flow was raised in October 2013 when the Board asked for "further clarification on impacts and mitigation measures," including "residential water pressure [and] fire flow." Martha's response did not come until June 2017. That response was what the Board considered and approved at the hearings in September-October of that year.

The plaintiffs' position would have us to believe that the Board ignored its obligation under sections 21091–21092.5—not to mention the Brown Act— to provide notice to the public of what the Board would be considering at a noticed public hearing, and its obligation to allow an opportunity for response from private individuals and (if need be) other public agencies. Such a position cannot rest on inference, but must have evidence behind it to overcome the statutory presumption that the Board complied with that duty. (Evid. Code, § 664; *Gilroy Citizens for Responsible Planning v. City of Gilroy*, *supra*, 140 Cal.App.4th 911, 919.) This, plaintiffs do not provide, hence it's point was not preserved for judicial review.

Moreover, to try to confine the subject of the supposed surreptitious maneuver to the monitoring program is to mistake a tree for the forest. The subject of the hearings was not simply the monitoring program, but *the entire draft EIR*, together with the ancillary permits and approvals necessary to get the project underway. In other words, *everything* was on the agenda. It is simply not credible for plaintiffs to claim they were expecting the monitoring program to have a greater prominence.

91

In any event, even if the merits had been preserved for review, plaintiffs would not prevail.

Simply saying that "The record fails to justify the reduced standards" is not sufficient to require anything further from this court. (Cal. Rules, of Court, rule 8.204(a)(1)(B)–(C).) It is a blatant attempt to throw the burden on respondent and this court to disprove the naked claim that the Board, and the trial court, acted without proper support. That is not how the appellate process works. (See, e.g., *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162. [" '[A]n appellant must do more than assert error and leave it to the appellate court . . . ' "]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102 [" 'Instead of a fair and sincere effort to show the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. And it is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondent. An appellant is not permitted to evade or shift his responsibility in this manner' "].)

Two factors make this omission particularly striking. The first is that the underlying issue is public safety, and in this day and age, the question of fire danger is guaranteed to draw attention. Plaintiffs play on this in their brief by citing "the extreme fire dangers" that will result from the project being in an "urban-wildland interface . . . , where development occurs within undeveloped wildland and structures . . . located in close proximity to vegetative fuels." Second, rather than confront that Judge Chou decided the question against them, plaintiffs simply ignore that rejection. Our review may be de novo, but we invariably find it beneficial to examine the statements of decision made by the trial court judges deciding CEQA cases. Judge Chou's reasoning ran as follows:

"Commentators raised concerns about the adequacy and feasibility of these mitigation measures. . . . Martha subsequently submitted a modified Master Plan which relocated some lots downhill and located the new water tank to a 570 ft. elevation (instead of the proposed 590 ft.), while recognizing that several homes still would have inadequate water pressure which would require 'low pressure water service agreements' with MMWD similar to those currently in effect with some of the existing homeowners in the Hill Haven neighborhood. Importantly, MMWD reviewed the revised plan and in a letter to the County it determined that the modified Master Plan will meet the District's water supply standards on condition, inter alia: the new water tank's base remained at 570 ft. but the size increased to 265,000 gallons; the existing 1 million Paradise Drive Water Tank be reduced to 590,000 gallons and moved 50 ft. up the slope, which MMWD determined would improve fire flows and reduce pumping costs; install an Easton Point Tank pump station; and install specified-size piping throughout the subdivision. Based on these conditions, MMWD also completed an analysis of fire flow that would be available to serve lots under the modified Master Plan, and estimated the fire flow at the hydrants will range from anywhere from 900 to 3,650 gallons per minute (g.p.m.). The TFPD later confirmed in a July 19, 2017 letter to the County's Planning Department that these flow rates comply with the California Fire Code for the proposed subdivision, on condition that all new construction installs automatic fire sprinkler systems. Under the Code, the standard flow rate of 1,500 g.p.m. for one hour may be reduced to 750 g.p.m. for 1 hour for homes with fire sprinklers.

"MMWD's letter also noted that for those lots with water pressure less than the standard 40 psi, those homeowners will be required to enter into a Low-Pressure Agreement, and additionally for those houses with estimated

93

pressures below 30 psi, the owners will be required to install private pumps. In certifying the FEIR and conditionally approving the modified Master Plan, the Board of Supervisors adopted Mitigation Measures 5.7-7 and 5.7-8 with the changes noted above and incorporated all of these actions in the Conditions of Approval for the project. As mitigated, the Board found that domestic water service impacts and fire flow impacts will be reduced to less than significant levels.

"As further Conditions Of Approval, before it can obtain Design Review/Tentative Map Approval, Martha is required to 'work with the MMWD to make final water system design improvement plans and financial arrangements necessary to meet MMWD domestic service requirements and fire flow requirements specified by the Tiburon Fire District pursuant to the Uniform Fire Code. The applicant shall comply with the [MMWD's] standards as required.' Also, before the County can issue any building, grading or construction permits Martha must first obtain 'approval of reduced fire flow requirements from the TFPD' (as permitted in the 2007 California Fire Code) by implementing structural enhancements to proposed residences, including but not limited to: 'Upgrades to building sprinkler systems'; 'Utilizing non-combustible exterior building materials (Mitigation Measure 5.7- 8(b)' and; '[L]imit the size of proposed houses (total allowable square footage) as needed to meet fire flow requirements.' (Mitigation Measure 5.7-8(b).)

"The court rejects [plaintiffs'] contention and finds the requirements imposed by the County, as verified by the relevant agencies (MMWD and TFPD), provide substantial evidence to support the FEIR's conclusion that the impacts to domestic water pressure and fire flow are reduced to less than significant levels. (Guidelines, § 15091, subd. (b).)"

CEQA requires the public agency to adopt a "reporting or monitoring program . . . in order to mitigate or avoid significant effects on the environment." (§ 21081.6, subd. (a)(1).) Plaintiffs insist the County failed to adopt a mitigation monitoring and reporting plan that "adequately addresses the Project's fire flow impacts" and would "ensure that the Project's adopted mitigation measures would be carried out and enforced."

The adequacy of a mitigation monitoring program is evaluated according to the "rule of reason," which is deemed satisfied if the program is "reasonably feasible." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 446; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 380.)

Plaintiffs insist that nothing requires Martha to "actually implement any mitigation." This may be literally true, but it ignores logic and defies common sense. If Martha does not work with—and satisfy—the local water and fire authorities, the County will not issue the required permits. This carrot-and-stick approach is established and accepted.[38] (See Practice under the California Environmental Act, *supra*, § 18:14, p. 18-13; *Oakland Heritage Alliance v. City of Oakland*, *supra*, 195 Cal.App.4th 884, 906 ["a condition requiring compliance . . . may be proper where it is reasonable to expect compliance "].)

Plaintiffs find fault with Mitigation Measure 5-7.7 because, while it directs Martha to work with water authority to "develop a water supply plan" that "shall clearly show the adequate water pressures would be provided to the new houses at the project site," "there is no detail as to what the proposed

---

[38] We note that plaintiffs are in the anomalous position of relying on the Tiburon Fire Protection District to identify the problem, and then not trusting it to fix the problem.

'water supply plan' would entail," nor does it "identify what 'adequate water pressures' [should] be." Apart from requiring a level of detail that is at odds with the fundamental concept of the EIR (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th 502, 515 ["we do not require technical perfection or scientific certainty"]; Guidelines § 15151 ["An evaluation of the environmental effects of a proposed project need not be exhaustive"]), plaintiffs are assuming bad faith, if not actual incompetence, by responsible public agencies. Plaintiffs plainly do not believe that the local water authority will know what is an appropriate water pressure, nor can it be trusted to participate in formulating a bona fide and effective water supply plan. Similarly, plaintiffs plainly do not believe that the Tiburon Fire Authority either will know what is necessary for the protection of the community, or that it will not insist on those necessities, to the extent of blocking Martha's acquisition of building permits.[39] Nothing in CEQA authorizes an EIR to be held hostage to such unjustifiable suspicions.

## G. The Temporary On-Site Construction Road

Buried in Impact 5.1-9—"Project Impacts Related to Project Site Emergency Access"—is a matter that the private plaintiffs find objectionable. There relevant portions are as follows:

"**Road and Driveway Grades**——The maximum allowable grade for private roads and driveways is 18 percent. TPFD will allow grades up to 21 percent if the applicant can demonstrate to TFPD's satisfaction that there is no feasible way to reduce the driveway grade to 18 percent and TFPD

---

[39] Moreover, as Martha points out, any water supply system must satisfy the requirements of the California Fire Code.

96

determines it can serve the project. When grades exceeding 18 percent are necessary, grades of a maximum of 21percent are allowed for a maximum length of 200 feet within any 1,000-foot section of the driveway. Grades exceeding 18 percent must be paved with grooved, textured concrete to provide adequate traction. In addition, when the TFPD approves grades over 18 percent, a higher standard of building sprinklers is required as well as restrictions on building materials (i.e., no wood siding). [¶] . . . [¶]

"The temporary construction access road would have a 25 percent maximum grade. Although the construction access road is not intended for everyday traffic, and is not required for emergency access to the project site, the TFPD is concerned that requiring construction vehicles delivering heavy construction materials to travel on road grades that exceed maximum standard of 18 to 21 percent would create a safety hazard. The TFPD staff has stated that the District's response vehicles may not be able to utilize the construction access road in an emergency because the 25 percent slope/grade of the construction access road exceeded the District's road grade limit of 18 to 21 percent. The TFPD is concerned that an accident resulting from use of the construction access road would increase the risk of an incident at a location that would be difficult for TFPD personnel and equipment to access.

"The project sponsor submitted two letters with the application that address the feasibility of using the proposed temporary construction access road for construction vehicle access during site grading and preparation and building construction. Ghilotti Construction Company, a company with a long history of residential project construction in Marin County, stated that they reviewed the proposed temporary construction access road with a maximum 25 percent inclined grade, and that in their opinion the road would be adequate for the primary construction access for the project provided the

97

following recommendations are followed:

"The actual staging for building the temporary 1,600-foot-long construction access road may require staging points every 400 to 500 feet and may initially require the use of Ridge Road for access to the project site.

"Install and securely anchor some type of barrier (temporary K-rail, Metal Beam Guard Rail, etc.) on the outboard and downward edges of all road curves.

"As a precautionary measure, install an emergency stop/crash cushion array located in the center of the Forest Glen cul-de-sac.

"One-way radio control access to the construction access road shall be maintained during construction activity.

"Redhorse Construction Inc., a construction company with extensive experience in residential construction in Marin County, also reviewed the proposed design of the temporary construction access road and the letter prepared by the Ghilotti Construction Company.  Redhorse Construction concluded that the temporary construction access road design appeared to be suitable for use as access to the upper areas of the project site from Forest Glen Court for the purposes of individual lot development and residence construction.  Redhorse Construction endorsed the four recommendations of Ghilotti Construction Company and further recommended:

"The erection of construction speed limit signs on the road.

"The formulation of written access protocols for construction access road use.

"Adoption of emergency vehicle access procedures as part of the overall site safety program.

"Letters written by the two construction companies conclude that the proposed temporary construction access road design would be feasible for

construction vehicle access during site development and home construction. Implementation of Ghilotti Construction and Redhorse Construction companies' recommendations would establish access protocols for construction access road use, meter activity to one construction vehicle at a time, limit equipment speeds on the road, provide additional safety barriers on the road turns, and an emergency stop/crash cushion.  In addition the formulation and adoption of emergency vehicle access procedures would provide a planned response to an incident anywhere on the project site. Implementation of all the recommendations would not eliminate the possibility of an accident, but implementation would reduce the risk of a serious accident to a less-than-significant level.

"The TFPD believes the applicant's proposal to keep the temporary construction access road as a possible means of egress from the project site in an emergency would constitute a hazard for vehicles because the road is too steep to serve as a safe secondary means of emergency egress from the Easton Point development.  In addition, the temporary construction access road was not designed or intended to safely handle traffic without protocols, metering and overall use supervision.  Therefore allowing the use of the construction access road for egress in an emergency would constitute a significant safety risk and would be a significant impact."  [¶] . . . [¶]

"For the reasons stated above (driveway widths, needed turnouts, excessive road grade for the construction access road), the project would result in a significant impact to emergency access.

"**Mitigation Measure** 5.1-9  Revise the PDP to provide turnouts per TFPD requirements for driveways.  Post all turnouts with 'no parking' signs. Close the temporary construction access road to all use after cessation of construction, unless specifically approved by the TFPD for emergency use.

"**Significance After Mitigation**  Implementation of Mitigation Measure 5.1-9 would reduce the project's impact to emergency access to a less-than-significant level.

"**Responsibility and Monitoring**  The applicant would be responsible for design and installation of these measures in accordance with Marin County and TFPD standards.  Marin County would be responsible for construction permitting, inspecting, and completion verification."  (Fns. & original italics omitted.)

Plaintiffs contend the EIR "offers no analysis of the safety impacts associated with the specter of heavy construction vehicles traversing the nearly one-third mile segment at a grade over four times the County standard."  Moreover, "while the road poses obvious dangers to those who use it, it will also pose unassessed dangers to the community.  The upper section of the road will pass through existing landslide areas.  The area proses an extreme fire hazard from dead and dry undergrowth and dense vegetation needing only an ignition source, such as from a truck accident, to spark a fire storm. . . .  The road would also be constructed contiguous to public open space trails, posing risks to pedestrians and others."  Finally, the EIR had "no analysis or any consideration whatsoever to the safety of [the] extreme grade in inclement weather conditions."

Judge Chou accurately summarized the tenor of plaintiffs' argument, the fatal flaw in its underlying premise, and why it had to be rejected:

"[Plaintiffs ask] the court to believe that heavy construction vehicles are at risk of careening into public spaces and thoroughfares, endangering pedestrians, bicyclists and drivers.  There is nothing remotely in the record to support such a scenario.  The construction access road does not intersect

100

Paradise Drive,[40] and it will not be used by the public. . . . Only the new residential street, Forest Glen Court, intersects Paradise Drive on the northeastern portion of the project. The construction access road is confined to Martha's property and there is no evidence that the construction access road will interfere with hikers using authorized trails.[41] [¶] . . . [¶]

"Here, it is the use of the road, not its construction, that [plaintiffs identify] as creating a significant environmental impact. But the administrative record does not contain substantial evidence showing that this aspect of the project [the construction access road] will worsen environmental hazards that are already present on the site. The planned construction access road will do nothing to exacerbate the steep grades already existing in the terrain. To the contrary, the record evidence shows the developer adopted procedures and improvements to substantially lessen the safety risks to drivers and workers who will use that road during all phases of the project. While the safety of the drivers and workers using that construction access road is a legitimate workplace concern, the Court finds that the safety issues raised by [plaintiffs] do not constitute a physical change in the environment that is reviewable under CEQA.

"Further, to the extent CEQA review is concerned with the effect of a project on public health and safety, there is no legal authority that requires CEQA review of the safety risks posed by the existing environment to the

---

[40] To refresh, Paradise Drive is the sole route on the northern side of the Tiburon Peninsula leading into the Town. It has one lane in each direction, is heavily travelled, and almost completely developed with residential housing.

[41] Although it seemed to be an open question at the time, it is now settled that there are no "authorized" public access trails on the Martha property. (See fn. 10, *ante*.) As already mentioned, the County may subsequently establish hiking trails in the open space acreage.

101

workers who are building the project.  A similar claim was rejected in *Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768 . . . .  [¶] . . . [¶]

"Here, as in *Parker Shattuck*, the persons at risk from using the construction access road are the workers only.  The use of the above-grade road for construction purposes does not impact the public generally, and consideration of these risks to a particular group of people, rather than to the public in general, is not a CEQA concern.  Also, any safety risk will cease once the project is completed and the workers leave.  (See *Saltonstall*[, *supra*,] 234 Cal.App.4th 549, 584 [EIR need not consider how the safety of persons at the site of the project's downtown sports arena may be affected since crowd safety is not an *environmental* effect of the project].)

"The County went beyond the requirements of CEQA to discuss this issue, and should not be penalized for being more comprehensive than CEQA demands.  Based on the record and the authorities discussed, the Court concludes that CEQA does not require the FEIR to analyze the potential safety risks to workers on the project that may arise from using the construction access road in building the development, as this does not constitute a significant environmental impact subject to CEQA."  (Italics omitted.)

Plaintiffs make no mention of any of the authorities cited by Judge Chou, much less try to distinguish them or show them inapposite.  Plaintiffs point to no authority contradicting Judge Chou's conclusion that "there is no legal authority that requires CEQA review of the safety risks posed by the existing environment to the workers who are building the project."  Thus, plaintiffs tacitly accept the starting point of his reasoning—that "it is the use of the road, not its construction" which agitates them.

Plaintiffs do not dispute as inaccurate any of Judge Chou's topographically-related conclusions, specifically: (1) that the proposed construction access road will be entirely within the property limits; (2) that, when built, it will not be accessible to, or used by, the public; (3) that it will not intersect any existing public street; (4) there will be no danger to civilian pedestrians on the property (see fn. 41, *ante*), and; (5) that the road will exist only during construction. Thus, plaintiffs must accept that the road will be gone when the residences are sold, and therefore will be no danger when families move in.

Plaintiffs have no answer for Martha's trenchant argument: "[Plaintiffs] note . . . that some of the road would be in a landslide area. But nothing suggests the road itself would increase landslide risks, and landslides were evaluated in the EIR and, with mitigation, found not to be significant. [Plaintiffs] also vaguely reference fire. But nothing suggests that the road poses a fire risk, and the EIR evaluated fire risks and found impacts would be less than significant. . . . To the extent that any landslide or fire risks exist, they are existing conditions on the Property." For our part, we are impressed that neither the Town nor the plaintiffs ever challenged the EIR's treatment of either "Landsliding" or the "Woodland Fire Hazard."

Most significantly, plaintiffs make no attempt to disprove Judge Chou's conclusions that (1) "the administrative record *does not* contain substantial evidence showing that this aspect of the project will worsen environmental hazards that are already present on the site," and (2) the administrative record *does* contain substantial evidence that Martha "adopted procedures and improvements <u>to substantially lessen</u> the safety risks to drivers and workers who will use that road during all phases of the project." (Emphasis added.)

The *Parker Shattuck* court noted that "In general, CEQA does not regulate environmental changes that do not affect the public at large." (*Parker Shattuck Neighbors v. Berkeley City Council*, *supra*, 222 Cal.App.4th 768, 782.)  As authority, the *Parker Shattuck* court cited *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492, where the court stated that "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons."  Plaintiffs' invocation of the potential fire danger is an obvious attempt to escape this principle.  We find it unavailing.

If there were such a danger from use of the access road, it would be natural for it to attract the attention of the local fire authority.  However, even the comments from the Tiburon Fire Protection District cited in plaintiffs' brief, deal only with the individual safety of persons (including their own) using the road.  There is not a single mention of any possibility of fire generated within the site endangering nearby residences.  Moreover, Martha points out that the District's expressed concerns related to the original road design, not the redesigned version.

It is clear that plaintiffs do not believe the conclusion of the two construction firms and one traffic expert that such a road was feasible and could be made safe.  But the issue of whether that conclusion was credible is not for the courts, but only the Marin County Board of Supervisors, as the agency approving the project.

Judge Chou observed that "The County went beyond the requirements of CEQA . . . and should not be penalized for being more comprehensive than CEQA demands."  Our examination of the administrative record has more than confirmed that sentiment.  (See footnote 24, and text accompanying footnote 18, *ante*.)

104

**Some Concluding Observations**

It may be wondered why, if our review is de novo, we have quoted the trial judge's statement of decision at such length. There are two reasons.

The first is a general consideration. "[T]he superior courts in all counties with a population of more than 200,000 shall designate one or more judges to develop expertise in" handling CEQA cases. (§ 21167.1, subd. (b).) Such cases "shall [have] preference over all other civil actions." (*Id.*, subd. (a).) Thus, if a CEQA case reaches us (where it also has calendar preference) the chances are that it has been addressed by a judge who is not a novice and may have been laboring under considerable time constraints. Nevertheless, as shown in this case, we invariably see a statement of decision that dwarfs those we see in other administrative mandamus cases. It is foolish to believe the reviewing court is not going to look at it with less than a good deal of respect—as we do with Judge Chou's statement here.

The second reason is specific and practical. Many issues under CEQA are questions of whether substantial evidence in the administrative record supports the challenged agency decision. When a trial court has concluded that there is substantial evidence, and identified precisely what it is, a reviewing court is going to presume that the trial court's decision is correct. And the reviewing court is naturally going to look at what the trial court has identified as such supporting evidence. As shown here, it is pointless for appealing counsel to argue the issue de novo. The only hope for prevailing on appeal is to meet the issue head on, and demonstrate why the evidence identified *by the trial court* does not constitute substantial evidence.

In 2009, in the first of what would be three appeals, this court wrote: "It is probably a truism that since adoption of the California Environmental Quality Act . . . every developer has at some point before construction starts ground his

105

teeth or clenched her fists in frustration while enduring the often lengthy process leading to certification of an environmental impact report . . . for the project." (*Schellinger Brothers v. City of Sebastopol*, *supra*, 179 Cal.App.4th 1245, 1249.) And as we went on to describe in the third appeal, it was a "development ensnared in a bureaucratic and politically charged morass that saw the certification of an EIR stymied for years." (*Schellinger Bros. v. Cotter* (2016) 2 Cal.App.5th 984, 987.) There, five years.

Similar concerns came to be expressed by some members of the Supreme Court. While delay was not a concern for the majority in *Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th 204, it was for Justice Chin, in dissent. A majority of the Supreme Court held that the EIR was defective in two respects. Justice Chin disagreed that the EIR was deficient on those points, but it is the matter of delay that is relevant here.

Justice Chin noted that "work on the current EIR began around 2005. After some five years of work, public comment, and revisions, the final EIR was certified in 2010." (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th 204, 247 (dis. opn. of Chin, J.).) That was only the beginning. Five years later, "this appeal will end, and the writ will issue. At some point after that, the EIR will have to be revised, with the necessary period of public comment, etc. . . . Then it is predictable that yet more litigation will follow the finalization of the new EIR. Given the glacial pace of litigation, this will easily take years." (*Id*. at p. 254 (dis. opn. of Chin, J.).)

Justice Chin concluded with a warning worthy of Cassandra: "We have 'caution[ed] that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.'" (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th 204, 253, quoting *Citizens of*

*Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d 553, 576 (dis. opn. of Chin, J.).) Every member of the court agreed that "CEQA is not intended as a population control measure." (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th 204, 220; *id*. at pp. 245, 254 (dis. opn. of Chin, J.).) However, for Justice Chin—and Justice Corrigan, who shared his concern (*id*. at p. 244 (conc. & dis. opn. of Corrigan, J.)—CEQA litigation threatened to become "a never-ending battle of attrition with ever-changing targets for project opponents to aim for." (*Id*. at p. 245 (dis. opn. of Chin, J.).) "Delay can become its own reward for project opponents. . . . [T]his is a recipe for paralysis. But CEQA is not meant to cause paralysis." (*Id*. at p. 254 (dis. opn. of Chin, J.).)

This case vindicates the worst of Justice Chin's fears.

He was dealing with a proposed project that would over 20 years house almost 21,000 people on 12,000 acres. The scope of Martha's project has always been immensely more modest. In fact, since the 1976 Judgment, Martha appears to have never sought to build more than 43 units on the property. We'll say it again—43 single-family residences. Not a steel mill by a major river. Not a new municipal airport. Forty-three suburban homes.

This dispute is almost as old as CEQA itself. When finally certified in 2017, the EIR had been more than 20 years in the making, ballooning to almost three times the recommended maximum size of 300 pages. And now it is 2022, five more years later.

CEQA was meant to serve noble purposes, but it can be manipulated to be a formidable tool of obstruction, particularly against proposed projects that will increase housing density. (Comment, *A Twisted Fate: How California's Premier Environmental Law Has Worsened the State's Housing Crisis and How To Fix It* (2022) 49 Pepperdine L. Rev. 413, 467 ["CEQA has not aged well, as the wrong people have discovered the right ways to make CEQA serve their own interests"];

107

Hernandez, *California's Environmental Quality Act Lawsuits and California's Housing Crisis* (2018) 24 Hastings Environ. L. J. 21, 23 ["The top [CEQA] lawsuit targets remain infill housing and . . . plans to increase housing densities"], 25 ["CEQA lawsuit abuse is worsening California's housing crisis"].) One knowledgeable attorney came to the depressing conclusion that "[n]ew housing projects were *the* most frequent target of CEQA lawsuits," and "the percentage of CEQA lawsuits against new housing units" has even been increasing in recent years. (*Id* at p. 29, italics added.) From her experience, a CEQA lawsuit "provide[s] a uniquely powerful legal tool to block, delay, or leverage economic and other agendas," and "is now the tool of choice for resisting change that would accommodate more people in existing communities." (*Id*. at pp. 41, 40.)

All of these developments and observations are vindicated in this woeful record before us.

It must be tough enough when the opposition is purely private. However, when private opposition is joined with official hostility, CEQA becomes an even more fearsome weapon. When the project proponent faces sustained private opposition, plus the combined animus of two levels of local government, the temptation to throw in the towel must be overwhelming.

Something is very wrong with this picture.

## DISPOSITION

The judgment is affirmed.

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *

*Tiburon Open Space Committee v. County of Marin* (A159860)

 *Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Marin County Superior Court |
| Trial Judge: | Honorable James T. Chou |
| Attorney for Plaintiffs and Appellants, Tiburon Open Space Committee: | Jeffer Mangels Butler & Mitchell LLP, Matthew D. Hinks; Mintz Levin Cohn Ferris Glovsky and Popeo P.C., Jonathan Welner |
| Attorney for Defendants and Respondents, County of Marin: | Brian E. Washington, County Counsel, Brian C. Case, Deputy, Brandon W. Halter, Deputy |
| Attorney for Appellant, Town of Tiburon: | Burke, Williams & Sorensen, LLP, Benjamin L. Stock, Kevin D. Siegel |
| Attorney for Real Party in Interest, The Martha Company: | Cox, Castle & Nicholson LLP, Michael H. Zischke, Andrew B. Sabey, James M. Purvis. |